STATE OF NORTH CAROLINA v. JIMMY LEE CREWS

No. 43

(Filed 25 January 1974)

1. Criminal Law § 163— exceptions to charge

Exceptions to the charge which do not point out specific portions of the charge as erroneous are ineffectual as bases for assignments of error.

2. Criminal Law § 163— assignments of error to charge

Assignments of error to the charge were defective in failing to quote in each assignment the portion of the charge to which appellant objects.

3. Criminal Law § 163— failure to charge — assignments of error

Where an assignment of error is based on failure to charge, it must set out appellant's contention as to what the court should have charged.

4. Homicide § 27— failure to instruct on voluntary manslaughter — instruction on involuntary manslaughter

In a prosecution of defendant for the murder of his wife, defendant was not entitled to an instruction on voluntary manslaughter and was not prejudiced by the court's submission of involuntary manslaughter as a possible verdict where the State's evidence tended to show that defendant intentionally shot and killed his wife, there was no evidence that defendant shot his wife in the heat of passion or in self-defense, and defendant's testimony was to the effect that the pistol discharged when his mother-in-law was attempting to take the pistol from him.

5. Homicide § 25— instructions — premeditation and deliberation — consideration of defendant's conduct after homicide

The court's instruction in a homicide case that in determining the question of premeditation and deliberation the jury might consider defendant's conduct before and after as well as at the time of the homicide and all attendant circumstances did not permit the jury to consider defendant's flight on the question of premeditation and deliberation, and the court did not err in failing to charge on the law of flight after having given such instruction.

6. Homicide § 14— accident or misadventure — burden of proof

A contention by defendant that a homicide was the result of accident or misadventure is merely a denial of guilt and does not constitute an affirmative defense, and no burden of proof rests on defendant to show accident or misadventure.

7. Criminal Law § 6; Homicide § 28— murder case — evidence defendant had been drinking — instructions

The trial court in a homicide prosecution properly instructed the jury that it could consider defendant's testimony that he had been

State v. Crews

drinking some whiskey as bearing upon whether the State had satisfied the jury beyond a reasonable doubt that defendant intentionally shot the victim and thereby proximately caused her death and that defendant unlawfully killed the victim in the execution of an actual specific intent to kill formed after premeditation and deliberation.

**8. Homicide § 27— instructions — involuntary manslaughter — reckless use of gun**

The trial court in a homicide case properly instructed the jury on the careless and reckless use of a gun as an element of involuntary manslaughter where defendant's testimony, if considered in the light most favorable to him, disclosed an unintentional homicide caused by his careless and reckless handling of the pistol.

**9. Criminal Law § 95— evidence competent for illustration — instructions at time of admission — further instructions in charge**

Where the court instructed the jury at the time exhibits were admitted that they were competent only to explain and illustrate the testimony of witnesses, the court was not required to repeat such instructions in the charge.

**10. Criminal Law § 76— admission of in-custody statements**

The *voir dire* evidence fully supported the court's evidentiary and ultimate findings that all statements made by defendant to police in another state were made freely, voluntarily and understandingly after defendant had been clearly and fully advised of all his constitutional rights, and the statements were properly admitted in defendant's homicide trial.

**11. Homicide § 20— photographs of victim's body — admission for illustration**

In this homicide prosecution, photographs of unclothed portions of the victim's body were properly admitted for the purpose of illustrating the testimony of a doctor with reference to the entrance of three bullets and the exit of two of them.

**12. Attorney and Client § 7— judgment against indigent defendant for counsel fees — notice and hearing**

Where the record afforded no basis for passing upon the validity of a judgment providing for the recovery of $1,000 by the State from defendant for services provided defendant as an indigent by the public defender, the Supreme Court vacated the judgment without prejudice to the State's right to apply for a judgment in accordance with G.S. 7A-455 after due notice to defendant and a hearing in the superior court.

APPEAL by defendant from *Lupton, J.,* 12 February 1973 Criminal Session of GUILFORD Superior Court.

Defendant was indicted and convicted for the first degree murder of his wife, Jevetta Louise Crews.

Uncontradicted evidence tends to show the facts narrated in the following numbered paragraphs.

1. The death of Jevetta Crews on 6 December 1972 was caused by gunshot wounds inflicted by bullets discharged from the .32 pistol in evidence as State's Exhibit No. 18. She was fatally injured and died in the home of her mother, Mrs. Ruby Hemphill, in Greensboro, N. C.

2. Prior to 6 December 1972 Jevetta, 27, and defendant, 32, had separated. On that date, Jevetta and Angela, 7, the daughter of Jevetta and defendant, were living in Greensboro with Mrs. Hemphill, Mr. Hemphill and Jimmy Henley, 13, Mrs. Hemphill's son by a former marriage. Mr. Hemphill was not at home on 6 December 1972 when defendant arrived or at any time defendant was in the Hemphill home.

3. On 6 December 1972 defendant lived alone in his house in High Point, N. C. From there he telephoned and talked to Jevetta, who was then in the Hemphill home. Later, defendant went to his uncle's service station in High Point. Without permission, he removed his uncle's .32 loaded pistol from the drawer where it was kept, stuck the pistol in his belt and proceeded to the Hemphill home in Greensboro. It was dark when he left his uncle's service station in High Point.

4. Defendant's finger was on the trigger of his uncle's .32 pistol (State's Exhibit No. 18) when it discharged the bullets which fatally injured Jevetta.

5. After Jevetta was shot, defendant left the Hemphill home. He drove from Greensboro on Interstate No. 85. The next day, 7 December 1972, in Montgomery, Alabama, defendant went voluntarily to the Police Department where, orally and in writing, he made statements to the Montgomery officers concerning what had happened the preceding night in Greensboro and delivered to them his uncle's .32 pistol. Defendant waived extradition and voluntarily returned to Greensboro with a Greensboro officer to whom the Montgomery officers delivered the .32 pistol.

6. Three bullets from the .32 pistol penetrated the body of Jevetta. Two passed through her body. They were picked up before her body was removed from the Hemphill home. One was removed from her body by the doctor who performed an autopsy.

The State's evidence as to what occurred while defendant was at the Hemphill house consists of the testimony of Mrs. Hemphill and of Jimmy Henley (hereafter Henley). Summarized, except when quoted, their testimony tends to show the facts narrated below.

Jevetta received a telephone call about 4:30 or 4:45 p.m. She talked ten or fifteen minutes and then went into the living room and sat down on the couch. About 7:00 p.m. Mrs. Hemphill observed that a car had stopped in front of her house. When she "cracked the door to see who it was," defendant pushed open the door and entered the living room. Jevetta and Angela were in the dining room. Henley was in his bedroom. Jevetta got up, went into the living room and there confronted defendant and said: "Jimmy, go back out. You know you're not wanted here. Go on and leave." After placing her hands upon defendant, Jevetta turned to Mrs. Hemphill and said: "Mother, he's got a gun." Mrs. Hemphill told her: "Get in yonder." Jevetta then turned around and started across the living room toward the hall. As she walked away, defendant pulled out his pistol and shot her. He fired this first shot into her back. Jevetta exclaimed, "Oh, my God, Jimmy," and then fell. As Mrs. Hemphill wrestled with him, defendant jerked loose from her grasp; and, as Jevetta lay on the floor, defendant "stood over top of her and shot her twice more." After he had fired the first of these shots, defendant said to Jevetta: "I told you I'd get you." He then fired the last shot. When these two shots were fired, Jevetta was lying on her back, with her feet in the living room and her head down the hall.

After the last two shots Mrs. Hemphill wrestled with defendant and got him away from Jevetta. Defendant pushed Mrs. Hemphill over a table and caused a lamp to fall across Jevetta's feet. Then defendant stepped back and pointed the pistol straight toward her chest. Grabbing his hand, she pushed it down on the couch. Defendant jerked away from her and ran out the door. Mrs. Hemphill asked the telephone operator to send the police and an ambulance. After making this call, she went over to her daughter, picking the lamp up off the floor in order to get to her. Blood was gushing out of Jevetta's mouth. Jevetta's body remained in the same position until the officers arrived. Mrs. Hemphill stepped on and picked up a bullet which she handed to an officer.

The pistol fired by defendant had been "stuck down in his sweater." Mrs. Hemphill saw him pull it out before firing the first shot.

When defendant fired the first shot, Angela ran out the back door and "went to a neighbor's."

When defendant entered the living room, Henley ran into the hall. He heard Jevetta, his sister, tell Mrs. Hemphill that defendant had a gun and heard Mrs. Hemphill tell Jevetta to go to the back room. Jevetta was coming toward Henley when defendant pulled out the pistol. He shot her as she reached the edge of the hall, close to where Henley was standing. Henley ran into the bedroom and was under his bed when the last two shots were fired. After he heard defendant's car "spinning off," Henley went back into the hall and saw Jevetta. Blood was coming out of her mouth, nose and ears.

Officers Jones and Nesbit arrived at the Hemphill home some eight minutes after 7:00 p.m. Their examination of Jevetta disclosed no signs of life. She was lying on her back. Her feet and lower legs were in the living room; the rest of her body was down the hall. Officer Bozarth, of the Police Department Identification Section, arrived at 7:46 p.m. Jevetta's body had not been moved. Bozarth made photographs of the area, and he and Officer Jones made measurements. The officers used these photographs to explain and illustrate their detailed observations at the scene.

The body was removed by ambulance from the Hemphill home about 8:20 p.m. to Cone Hospital where photographs were made of portions of the unclothed body of Jevetta. Three of these photographs were used to explain and illustrate the testimony of the officers and of the doctor who performed the autopsy with reference to the points of entrance and exit of the bullets.

The testimony of Dr. William Womble Forrest, the pathologist who performed the autopsy, includes the following: One of the three bullets entered at the left back, up high, about six inches down from the top of the shoulder and about three inches to the left of the vertebral column. It went through the left lung, caused hemorrhage in the left chest cavity, and came out in front. The entrance wounds of the two other bullets were on the front of the body, one at the right breast and the other at the abdomen just below the rib cage.

Detective J. C. Cunningham, of the Police Department from Montgomery, Alabama, testified to what happened in Montgomery. His testimony, summarized except when quoted, is narrated below.

On 7 December 1972, in response to a call from headquarters, he went to the office of Lt. Buchli, his supervisor. Buchli and defendant were sitting in Buchli's office. Defendant was drinking a cup of coffee and was crying. Buchli told him that defendant had a problem and asked him to see if he could help defendant. When he asked "what was his problem," defendant told Cunningham that "he had killed his wife on the previous night in Greensboro, North Carolina." He then stopped defendant from making any further statement and advised him orally of his constitutional rights. He and the defendant then went back to his office or interrogation room. There he read from a card the constitutional rights of defendant and had defendant read back his constitutional rights as stated on the card. Defendant read "in a competent manner." Defendant stated that he understood his constitutional rights and thereupon signed the waiver of rights statement admitted in evidence as State's Exhibit No. 17. After designating when and where the statement is made, and that "[t]he charge is homicide," the statement sets forth in detail each of the constitutional rights delineated in *Miranda*. The following words appear immediately above defendant's signature: "I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promises or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone." This statement was signed in Cunningham's presence at 11:05 a.m.

Defendant then told Cunningham that "he knew [his wife] was dead because he shot her once and she fell and he shot her two or three more times."

During their conversation, defendant told Cunningham that the pistol which he had used was in his car, under the front seat. He took defendant back to Buchli while he (Cunningham) made a phone call. Buchli and defendant went downstairs and came back with the pistol which defendant had volunteered to get for them. "It was a nickle silver .32 Smith and Wesson long Arminus revolver," bearing Serial Number 149320 "on the swing-out." Defendant turned over this pistol to Cunningham

and identified it as the weapon with which he had shot his wife. The pistol was admitted into evidence as State's Exhibit No. 18.

Cunningham called Greensboro and talked to Detective Schmidt, who advised him that there was a warrant for Jimmy Crews charging him with murder and requested that defendant be held for the Greensboro Police Department.

Following the brief oral statement made by defendant, defendant was afforded an opportunity "to be fed, washed, cleaned up, and relieve himself." At 12:40 p.m., after having been again fully advised of his constitutional rights, defendant signed a waiver of rights form exactly like the one he had previously signed and shortly thereafter made a narration of facts which was reduced to writing and signed by him. This second waiver of rights form and defendant's written statement were identified as defendant's Exhibit No. 1 and defendant's Exhibit No. 2, respectively. The written narrative, defendant's Exhibit No. 2, differs from oral statements attributed to defendant by Cunningham in respects noted below.

Evidence offered by defendant consists of (1) his testimony, (2) the testimony of four witnesses to the effect defendant's general reputation is good, and (3) defendant's Exhibits Nos. 1 and 2.

Summarized, except when quoted, defendant testified as narrated below.

He went to his mother-in-law's house to talk to his wife and get her to come home. He knocked on the door. Mrs. Hemphill opened the door and let him in. When he walked inside his wife walked over to him and asked what he wanted. His reply was that he wanted to talk to her. Mrs. Hemphill was standing to his left and Jevetta approached him and put her hands on his sweater at the place where he had the pistol. She hollered, "[h]e's got a gun." Mrs. Hemphill grabbed him. He pulled the gun out. In his struggle with Mrs. Hemphill the gun went off, possibly two or three times. He heard the shots, looked up and saw his wife. She "was kind of facing us" but "was falling on the floor" and "that was when [he] left."

Defendant testified that he didn't "really know why [he] took the gun out of [his] pants." He "just thought maybe [his] mother-in-law was going to try to get the gun." He "did not at any time get down over [his] wife to [his] recollection, as [his]

mother-in-law [had] testified about." He didn't "believe that [he] did that."

At the Police Station in Montgomery he told "the first detective that [he] talked to that [he] believed [he] had killed [his] wife." He was told to sit down and some coffee was brought to him. Detective Cunningham was called and soon came into the room. In answer to Cunningham's question, "[w]hat is the problem?", defendant told Cunningham "that [he] thought that [he] had killed [his] wife." When Cunningham asked, "Well, how do you know?", defendant told him "that [he] seen her falling on the floor." When asked how many times defendant shot, defendant told him "two or three or four times." Cunningham suggested that it might not be as serious as defendant thought because he had observed cases where people were still alive from that many wounds or shots and that he would call the Greensboro Police Department. While Cunningham was making this telephone call, defendant went with the other detective and got the gun. Cunningham returned, bringing word that defendant's wife was dead. Then defendant was taken to a small cell and was brought some food and some coffee. Later, he signed defendant's Exhibit No. 1 and defendant's Exhibit No. 2. Defendant identified the signature on State's Exhibit No. 17 as his signature but testified he didn't remember signing it.

Defendant's testimony on cross-examination includes the following:

After his telephone conversation with Jevetta, but before he went to his uncle's filling station and got the .32 pistol, defendant went to "the post" and "had fellowship with some members," and there "was drinking some . . . whiskey." Later, when he got the pistol he stuck it in his belt and then went over to Greensboro. He knew "that [he] was not welcome there . . . that the folks that owned the house didn't want [him] there." He didn't "remember Mrs. Hemphill telling her daughter to get out of there." He did not pull the gun out until Mrs. Hemphill had grabbed him. Jevetta had turned away from him and was going toward the hall. Mrs. Hemphill grabbed him. He pulled the gun away from her, trying to keep her from getting the gun. At this time, "the gun went off." He testified: "Yes, sir, I had my finger on the trigger. . . . No, sir, I don't suppose there is anyway in the world to make this gun fire unless I pull that trigger." During his struggle with Mrs. Hemphill, the gun went off "a few more times." He did not go over to his wife when

State v. Crews

she was on the floor and fire shots into her. His wife fell over at the start of the hallway.

Defendant testified that he didn't believe he had told Cunningham that he had shot his wife some more after she fell. He testified: "No, sir, I won't deny telling him that because I don't know if I told him that or not."

Defendant admitted he had "struck" his wife "two or three times" on prior occasions and that, on one occasion, he had been convicted and sentenced for assaulting her with a deadly weapon.

Defendant's Exhibit No. 2 contains no statement to the effect that defendant shot his wife after she had fallen. It contains the following with reference to what occurred at the Hemphill home:

"I went to the door and they let me in. I just wanted to talk to her. They got to feeling under my sweater and they felt my gun. They got to hollering and screaming and trying to get the gun. While they was trying to get it, I believe I pulled it out.

"All of a sudden, the gun went off. I don't know how many times. It was three or four. I'm not sure. Jevetta fell and I ran. I went to my car and just drove and drove. I got where I couldn't stand it no more and that's when I came in here and told you about what happened. I didn't mean to kill her. I just wanted to talk to her."

The court submitted as a permissible verdict: (1) Guilty of murder in the first degree; (2) guilty of murder in the second degree; (3) guilty of involuntary manslaughter; or (4) not guilty.

The jury returned a verdict of guilty of murder in the first degree. Judgment imposing a sentence of life imprisonment was pronounced.

Based on defendant's affidavit of indigency, the Public Defender was appointed to represent him and did represent him at his preliminary hearing and throughout his trial. After judgment was pronounced, the Public Defender made appropriate appeal entries and ordered the preparation of a transcript for use in preparing defendant's case on appeal. Upon receipt of the transcript, the Public Defender delivered it to Stephen E. Lawing, Esquire, defendant's present counsel, who had been

privately retained to perfect the appeal and represent defendant in connection therewith. The Public Defender was permitted to withdraw as counsel and was relieved of further responsibility. On account of delay in perfecting the appeal, this Court issued its writ of certiorari and allowed additional time for defendant's present counsel to perfect the appeal.

*Attorney General Robert Morgan and Assistant Attorneys General Edward L. Eatman, Jr. and Ralf F. Haskell for the State.*

*Stephen E. Lawing for defendant appellant.*

BOBBITT, Chief Justice.

None of defendant's assignments of error challenges the sufficiency of the evidence to support the verdict of guilty of murder in the first degree. Obviously, there was ample evidence to warrant and support that verdict.

Defendant listed nineteen assignments of error. His brief states that Assignments Nos. 7, 8, 9, 10 and 13 are not brought forward. It contains no discussion of or reference to Assignments Nos. 14, 15 and 16. These eight assignments "will be taken as abandoned by him." Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 783, 810; *State v. Gordon,* 241 N.C. 356, 362, 85 S.E. 2d 322, 327 (1955).

Of the remaining eleven assignments, Nos. 1, 2, 3, 4, 5, 6, 11 and 18 refer to the court's charge; and Nos. 12 and 17 refer to the admission of evidence. Assignment No. 19 refers to a judgment for counsel fees entered after completion of the trial.

[1] We consider first those assignments which refer to the charge. We notice first that neither the exceptions nor the assignments comply with the Rules of Practice in the Supreme Court. These words and figures, "Exceptions Nos. 24, 25, 33, 32, 27, 26, 35," appear in the record immediately following the court's charge. Exceptions bearing these numbers do not appear *in* the charge. These words and figures do appear at intervals *in* the charge: "Exceptions Nos. 28 and 34"; "Exception No. 30"; "Exception No. 29"; and "Exception No. 31." None of these exceptions identifies by brackets or otherwise any particular portion of the charge to which exception is taken. These exceptions are ineffectual as bases for assignments of error in that

they do not point out specific portions of the charge as erroneous.

**[2, 3]** Moreover, those assignments of error which refer to the charge are also defective because of defendant's failure to comply with the requirement that the appellant quote in each assignment the portion of the charge to which he objects. Too, where an assignment is based on failure to charge, it is necessary to set out the appellant's contention as to what the court should have charged. *State v. Wilson,* 263 N.C. 533, 139 S.E. 2d 736 (1965) ; *State v. Kirby,* 276 N.C. 123, 131, 171 S.E. 2d 416, 422 (1970).

None of defendant's assignments of error comply with well established appellate rules. Notwithstanding, since a life sentence is involved, we have elected to discuss defendant's contentions.

**[4]** In Assignment No. 1, defendant asserts "[t]he court erred by failing to charge the jury with respect to the lesser degrees of the crime charged, in that the court failed to charge the jury with respect to voluntary manslaughter." There appears immediately below this assignment the following: "Exception No. 24."

The court properly instructed the jury that, *if* the State satisfied the jury beyond a reasonable doubt that defendant by the use of a pistol, a deadly weapon, *intentionally* shot and thereby killed his wife, the law would raise two presumptions, (1) that the killing was unlawful, and (2) that it was done with malice. *State v. Barrow,* 276 N.C. 381, 390, 172 S.E. 2d 512, 518 (1970), and cases cited. There was no evidence that defendant shot his wife in the heat of passion or in self-defense. Defendant's testimony was to the effect that the pistol discharged accidentally when his mother-in-law was attempting to take the pistol from him. Under these circumstances defendant was not entitled to an instruction on voluntary manslaughter and was not prejudiced by the court's submission of involuntary manslaughter as a permissible verdict. *State v. Wrenn,* 279 N.C. 676, 683, 185 S.E. 2d 129, 133 (1971) ; *State v. Stimpson,* 279 N.C. 716, 724, 185 S.E. 2d 168, 173 (1971).

**[5]** In Assignment No. 2, defendant asserts "[t]he court erred by failing to charge the jury with respect to the law of flight." There appears immediately below this assignment the following: "Exception No. 25."

*In his brief,* defendant quotes this excerpt from the charge: "In determining the question of premeditation and deliberation, it is proper for the jury to take into consideration the conduct of the defendant before and after, as well as at the time of the event, that is the time that Jevetta Louise Crews was shot and all the attending circumstances."

The quoted instruction is in substantial accord with the statement of Chief Justice Stacy in *State v. Evans,* 198 N.C. 82, 84, 150 S.E. 678, 679 (1929).

Defendant contends his "after" conduct would include his flight from the scene of homicide, a circumstance for consideration only on the issue of guilt and not as tending to show premeditation and deliberation. *State v. Blanks,* 230 N.C. 501, 504, 53 S.E. 2d 452, 454 (1949).

In *State v. Marsh,* 234 N.C. 101, 105-06, 66 S.E. 2d 684, 687-88 (1951), Chief Justice Stacy, referring to essentially the same instruction in a case where no instruction was given with reference to the law of flight, said: "The court was here speaking to the purpose and intent in the defendant's mind at the time of the homicide. This, the jury must have understood. Moreover, there is no mention in the court's charge of the defendant's . . . flight. . . . Nor was there any request to charge on the significance of these circumstances or in what light they should be considered by the jury. Evidently, the defendant's conduct long after the homicide was not a matter of debate on the hearing. The immediate circumstances were apparently sufficient. The contention presently advanced seems to have been an afterthought."

In the present case the court gave no instruction with respect to flight. The court related the testimony, principally that of defendant, with reference to what defendant did from the time his wife was shot until he appeared voluntarily at the Police Station in Montgomery, Alabama. Nothing in the court's review of the State's contentions implies that the State contended defendant's trip to Montgomery, Alabama, was a circumstance to be considered as evidence tending to show premeditation or deliberation. Our consideration of this contention impels the conclusion that the court's failure "to charge the jury with respect to the law of flight," was not prejudicial to defendant.

In Assignment No. 3 defendant asserts "[t]he court erred by failing to charge the jury with respect to accidental homicide"; and in Assignment No. 4 he asserts "[t]he court erred by failing to charge the jury with respect to the degree of proof of the defense of accidental homicide and other defenses available to the defendant." There appear immediately below these assignments, respectively, the following: "Exception No. 33," "Exception No. 32."

[6] A defendant does not plead an affirmative defense by contending that the homicide was the result of accident or misadventure. This contention is merely a denial of guilt. No burden of proof rests on defendant to show accident or misadventure and the burden of proof rests upon the State to prove beyond a reasonable doubt all elements of the alleged crime. *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337 (1965) ; *State v. Fowler,* 268 N.C. 430, 150 S.E. 2d 731 (1966) ; *State v. Woods,* 278 N.C. 210, 179 S.E. 2d 358 (1971). We note this excerpt from the charge: "The court instructs you that if the killing of the deceased, Jevetta Louise Crews, was unintentional and not proximately caused by criminal negligence, then it would be your duty to return a verdict of not guilty."

[7] In Assignment of Error No. 5 defendant asserts "[t]he court erred by failing to charge the jury with respect to the law of intoxication"; and in Assignment No. 6 defendant asserts "[t]he court erred by failing to charge the jury with respect to the degree of proof of the defense of intoxication and other defenses." There appear immediately below these assignments, respectively, the following: "Exception No. 27," "Exception No. 26."

The court's charge includes the following: "[Y]ou will consider his [defendant's] testimony that he had been drinking some whiskey as bearing upon whether the State has satisfied the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot Jevetta Crews and thereby proximately caused her death, and you will also consider this as evidence as bearing upon whether the State has satisfied the jury from the evidence and beyond a reasonable doubt that the defendant unlawfully killed Jevetta Louise Crews in the execution of an actual specific intent to kill formed after premeditation and deliberation."

There is no evidence that defendant was intoxicated. The following is the only evidence relating to defendant's drinking. The statement defendant signed in Montgomery, defendant's Exhibit No. 2, includes the following: "I got to drinking and I went over there to her mama's house." On cross-examination, defendant testified that he drank *some* whiskey at "the post" in High Point before going to his uncle's service station.

Assuming, without deciding, there was sufficient evidence of defendant's drinking whiskey to justify an instruction with reference thereto, the instructions given were in accordance with our decisions. *State v. Propst,* 274 N.C. 62, 71-72, 161 S.E. 2d 560, 567 (1968) ; *State v. Bunn,* 283 N.C. 444, 196 S.E. 2d 777 (1973), and cases there cited.

[8]  In Assignment No. 11, defendant asserts "[t]he court erred in charging the jury as to the careless and reckless use of a gun constituting an element of involuntary manslaughter, there being no evidence of such careless or reckless use." There appears immediately below this assignment the following: "Exception No. 31."

The State's evidence is clear and positive to the effect that defendant intentionally shot and killed his wife. Defendant's testimony, if considered in the light most favorable to him, discloses an unintentional homicide caused by his careless and reckless handling of the pistol. The court's instructions with reference to involuntary manslaughter are in accord with our decisions. *State v. Foust,* 258 N.C. 453, 459, 128 S.E. 2d 889, 893 (1963) ; *State v. Phillips, supra,* at 517, 142 S.E. 2d at 343; *State v. Wrenn, supra,* at 683, 185 S.E. 2d at 133; *State v. Stimpson, supra,* at 724, 185 S.E. 2d at 173.

In Assignment No. 18, defendant asserts "[t]he court erred by failing to charge the jury that State's Exhibits 1 through 19, inclusive, were admitted as illustrative evidence only." There appears immediately below this assignment the following: "Exception No. 35."

[9]  In all instances, where exhibits such as photographs, diagrams, etc., were competent only to explain and illustrate the testimony of witnesses, the judge instructed the jury to this effect. When such proper instructions are given when the evidence is admitted, the judge is not required to repeat these instructions in the charge. This assignment refers to Exhibits Nos. 1-19, inclusive. Certain of the exhibits, for example, the

pistol, the bullets, Jevetta's robe, etc., were competent as substantive evidence. This assignment is broadside, ineffectual and without merit.

[10] In Assignment No. 12, defendant asserts "[t]he court erred in admitting into evidence defendant's statements not voluntarily made in violation of defendant's constitutional right against self-incrimination as guaranteed by the United States Constitution." There appears immediately below this assignment the following: "Exceptions 18 and 19."

The initial incriminating statement was made by defendant in Montgomery, Alabama, when he voluntarily went to the Police Station and reported that he had killed his wife the preceding night in Greensboro, North Carolina. Before admitting other statements made by defendant, a *voir dire* hearing was conducted. The evidence at *voir dire* fully supports the court's evidentiary and ultimate findings to the effect that all statements made by defendant in Montgomery, Alabama, were made freely, voluntarily and understandingly after the defendant had been clearly and fully advised of all his constitutional rights. Indeed, the manner in which defendant was treated by the Montgomery police is worthy of commendation.

[11] In Assignment No. 17, defendant asserts "[t]he court erred in allowing into evidence State's Exhibits 1 through 19 containing photographs and items highly prejudicial and inflammatory to the defendant." Again, defendant lumps together Exhibits Nos. 1-19, inclusive, without differentiation as to the nature and character of these exhibits. Any contention that the photographs of unclothed portions of the body of Jevetta were incompetent when offered and admitted to illustrate the testimony of the doctor with reference to the entrance of the three bullets and the exit of two of them is without merit. Evidence that Jevetta was shot in her upper back once and twice in the front in the area of her chest and abdomen strongly corroborated the testimony offered by the State. They were competent for use by the doctor to illustrate his testimony. *State v. Cutshall,* 278 N.C. 334, 347, 180 S.E. 2d 745, 753 (1971), and cases cited.

[12] In Assignment No. 19, defendant asserts that "[t]he court erred in entering an order and judgment against defendant for payment of counsel fees, said order appearing on page 9 of the petition for certiorari, dated February 16, 1973 and signed by

Lupton, Judge." There appears immediately below this assignment the following: "Exception No. 38." There appears in the record a judgment dated 16 February 1973 signed by Judge Lupton. This judgment provides for the recovery by the State of North Carolina from defendant of the sum of $1,000.00 for services provided defendant as an indigent by the Public Defender. Presumably this judgment was entered pursuant to G.S. 7A-455(b).

In his brief, defendant attacks this judgment on the following grounds: He asserts it was entered in his absence, without notice to him of any hearing with reference thereto, and without affording him any opportunity to be heard in connection therewith. He asserts further "that the judgment is in the nature of a civil judgment and there were not findings of fact nor conclusions of law sufficient to support such judgment pursuant to Rule 52 of the North Carolina Rules of Civil Procedure.

The record before us affords no basis for passing upon the validity of this judgment. Nothing therein supports or negates defendant's contentions. Under the circumstances, this Court, in the exercise of its supervisory jurisdiction, vacates this civil judgment without prejudice to the State's right to apply for a judgment in accordance with G.S. 7A-455 after due notice to defendant and a hearing on such application in the Superior Court of Guilford County.

With reference to verdict and judgment thereon: No error.

With reference to civil judgment for counsel fees: Judgment vacated and cause remanded with instructions.