STATE OF NORTH CAROLINA v. JAMES AVERY

No. 33

(Filed 12 March 1975)

1. **Constitutional Law § 29; Criminal Law § 135; Jury § 7— prospective jurors — death penalty views — challenge for cause**
    The trial court in a capital case did not err in the allowance of the State's challenge for cause of a prospective juror whose answers to questions by the solicitor, when read as a whole, made it clear that she would refuse to render a guilty verdict regardless of the evidence.

2. **Arrest and Bail § 7; Criminal Law § 75— refusal to allow phone call — subsequent confession — harmless error**

In this first degree murder prosecution, refusal of the chief of police to allow defendant to make a phone call until he gave the officer his name, date of birth and address, if erroneous, was harmless beyond a reasonable doubt where, shortly thereafter and before making any incriminating statements, defendant was told by the sheriff that a telephone was available if he desired to use it, and where the State presented other overwhelming evidence of defendant's guilt, including positive identification of defendant by an eyewitness.

3. **Constitutional Law § 32—confinement without appointment of counsel — waiver by defendant**

Defendant was not deprived of his constitutional right to the presence of counsel and his rights under G.S. 7A-453 and G.S. 15-47 were not violated by his confinement in jail for eight days without appointment of counsel where defendant told police officers he intended to procure his own attorney through friends in Washington, D. C. and did not want appointed counsel, and when it first became apparent that he was unable to secure such attorney, an attorney was appointed to represent him without further delay.

4. **Constitutional Law § 36; Criminal Law § 135— constitutionality of death penalty**

Defendant's constitutional and statutory rights were not violated by the imposition of the death penalty upon his conviction of first degree murder.

Chief Justice SHARP and Justices COPELAND and EXUM dissenting as to the death penalty.

APPEAL by defendant from *Peel, J.,* at the February 1974 Session of BERTIE Superior Court.

On an indictment proper in form, defendant was tried and convicted of the first degree murder of Carlton Woodrow Barham. Defendant appeals from a judgment imposing a sentence of death.

The testimony of Mrs. Nellie Ivy, a witness for the State, tends to show that on Saturday night, 29 September 1973, she was working part-time in Mr. Carlton Woodrow Barham's store just inside the city limits of Roxobel, N. C. She came to work about 5:30 p.m. At about 8:30 p.m., nearing closing time, she and Mr. Barham were alone in the store. She was standing near the cash register. Mr. Barham was proceeding toward the cash register from the back of the store where he had turned off the television. At this time, defendant came into the store with a hat over his hand. He removed the hat, uncovered a pistol, and said, "This is a hold-up. Give me your money." She then told

---

State v. Avery

---

Mr. Barham, "For the Lord's sake, give it to him." Mr. Barham emptied his cash register and put the money in defendant's hat, saying that was all the money he had. Defendant ordered her and Mr. Barham out from behind the counter so he could check the cash register for himself. Defendant then took the money in the hat, started toward the door, and turned around. She said, "Please don't shoot us," at which time defendant shot at her, hitting her in the stomach. He was seven to ten feet from her and she could see him clearly. Defendant fired another shot over her at Mr. Barham. She heard a total of three shots after the shot that struck her. She also heard Mr. Barham cry out. Defendant then left the store. She waited until she heard a car leave and then dragged herself outside seeking help. She identified the defendant at trial as the man who robbed the store and shot her and Mr. Barham.

An autopsy conducted the following day disclosed that Mr. Barham died from massive hemorrhages in the abdominal area caused by a gunshot wound.

Thomas James Bishop testified that he is a resident of Roxobel and that on the night in question he saw a dark-colored 1963 two-door Chevrolet with an antenna on the right rear run a stoplight at a high rate of speed about a mile down the road from Barham's store. The automobile was proceeding toward Murfreesboro. Bishop and Joe Herman then went down to Barham's store and saw Mrs. Ivy lying in the yard.

Deputy Sheriff Milton Morris testified that, based on Bishop's description of the automobile, the sheriff's office in Bertie County issued an alert at about 9:05 p.m.

Sergeant Robert E. Harris of the Murfreesboro Police Department testified that shortly after receiving the alert, he set up a traffic check at the west end of Murfreesboro. Within a few minutes, a car meeting the above description was sighted. After some hesitation, the driver of the 1963 Chevrolet, who was alone, pulled over to the side of the road in response to Sergeant Harris's blue light and siren. The defendant was the driver. Sergeant Harris noticed that defendant was fumbling at his feet as Harris approached the driver's side of the automobile. Defendant was unable to produce an operator's license and the registration card showed the automobile to belong to one James F. Robertson. As Sergeant Harris was reaching for the registration card, which was located on the dash of the car,

he saw the stock of a pistol protruding from beneath the seat of the automobile. The pistol was a .38-caliber Smith and Wesson revolver with four "spent" cartridges and two "live" cartridges in the chamber.

Sergeant Harris took defendant to the police station in Murfreesboro after giving him his *Miranda* rights. A search there revealed eleven other "live" .38-caliber cartridges in defendant's right pocket and $136 in defendant's left pocket.

Sheriff Edward H. Daniels testified that shortly before 3:00 a.m. on the morning of 30 September 1973, defendant confessed to the robbery and murder after an interrogation of about one hour.

Special Agent Frank Satterfield of the State Bureau of Investigation testified that, in his opinion, the bullets taken from Mr. Barham's body had been fired from the revolver found in the 1963 Chevrolet driven by defendant.

James F. Robertson testified that he was the owner of the 1963 Chevrolet driven by defendant and that it had been missing since the morning of 29 September 1973. He further testified that he did not give anyone permission to drive it and that he never owned a revolver nor kept one in his automobile.

Other law enforcement officers testified at various stages of the trial for corroborative purposes.

Defendant offered no evidence.

Other facts pertinent to decision are set out in the opinion.

*Attorney General Robert Morgan and Assistant Attorney General Lester V. Chalmers, Jr., for the State.*

*William W. Pritchett, Jr., for defendant appellant.*

MOORE, Justice.

[1] Defendant first contends that he was deprived of his constitutional right to trial by an impartial jury when the trial judge allowed juror Tilgiham to be dismissed upon challenge for cause by the State. Defendant asserts that Mrs. Tilgiham's objections to the death penalty were general and that she therefore should not have been dismissed for cause, citing *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968).

State v. Avery

During *voir dire,* the following transpired between the so-licitor and Mrs. Tilgiham:

"Q. And let me ask you this question. If you were satisfied from the evidence and beyond a reasonable doubt, would you vote for a verdict of guilty, realizing at the time you cast that vote that it would take this man's life?

"A. No. It is kind of a hard question about taking a person's life. I would have to think that over. I would hate to do that.

"Q. I am just asking you could you do that?

"A. I could if I . . . you know . . . I would have to think first.

"Q. Ma'am?

"A. Well, I could, you know, but I have . . . it is a hard thought to say what I would say about taking a man's life.

"Q. I am certainly not attempting to do anything except try to find out from you if you could and would do that.

"A. I can't. . . .

"Q. If you were satisfied from the evidence that the defendant was guilty of murder in the first degree, would you vote for a verdict of guilty realizing at the time that it would take his life?

"A. Well, it would be hard to take a person's life. It would be on my conscience.

"Q. I just want you to tell me if you could or could not do that?

"A. No, I don't feel like I could do that.

"Q. Under any circumstances regardless of the facts in any case would you vote for a verdict, in any case that would take this man's life?

"A. I wouldn't like to vote to take his life if I could help it.

"Q. Well, are you opposed under all circumstances and conditions to capital punishment?

"A. On the punishment, yes.

"Q. I said are you opposed to capital punishment?

"A. Well, yes.

"Q. You are?

"A. I think so as far as I know of taking his life.

"Q. Your Honor, I submit this woman for cause.

"COURT: All right. You may step down."

Since *Witherspoon,* this Court has consistently held that if a prospective juror states that under no circumstances could he vote for a verdict that would result in the imposition of the death penalty no matter how aggravated the case and regardless of the evidence shown, the trial court can properly dismiss the juror upon a challenge for cause. *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974) ; *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336 (1972) ; *State v. Watson,* 281 N.C. 221, 188 S.E. 2d 289 (1972) ; *State v. Cook,* 280 N.C. 642, 187 S.E. 2d 104 (1972) ; *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), modified on other grounds, 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2873 (1972) ; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969), modified on other grounds, 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971).

Whether a juror evidences absolute opposition to the death penalty so as to be excludable for cause under *Witherspoon* is a difficult question subject to seemingly inconsistent results on similar facts. See Annot., 39 A.L.R. 3d 550 (1971). We are aware of numerous decisions in other jurisdictions upholding challenges for cause on answers more equivocal than those of juror Tilgiham. *See, e.g., Paramore v. State,* 229 So. 2d 855 (Fla. 1969), modified on other grounds, 408 U.S. 935, 33 L.Ed. 2d 751, 92 S.Ct. 2857 (1972) ; *Williams v. State,* 228 So. 2d 377 (Fla. 1969), modified on other grounds, 408 U.S. 941, 33 L.Ed. 2d 765, 92 S.Ct. 2864 (1972) ; *State v. Conyers,* 58 N.J. 123, 275 A. 2d 721 (1971) ; *State v. Elliott,* 25 Ohio St. 2d 249, 54 Ohio Ops. 2d 371, 267 N.E. 2d 806 (1971), modified on other grounds, 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2872 (1972) ; *Koonce v. State,* 456 P. 2d 549 (Okla. Crim. 1969), modified

on other grounds, 408 U.S. 934, 33 L.Ed. 2d 748, 92 S.Ct. 2845 (1972) ; *Tezeno v. State,* 484 S.W. 2d 374 (Tex. 1972). We are also aware that a substantial number of death penalty cases have been reversed on the authority of *Witherspoon* in memorandum opinions by the United States Supreme Court. For a partial list, see *Tezeno, id.* at 383.

In *State v. Noell,* 284 N.C. 670, 202 S.E. 2d 750 (1974), we held that a prospective juror, Mrs. Rogers, was properly excused for cause after answering questions concerning her belief as to capital punishment as follows:

> " 'MR. PIERCE [the solicitor] : And Mrs. Rogers, let me ask you the same question, that I have been asking. Would it be impossible for you to bring in a verdict requiring the imposition of the death penalty, under any circumstances, no matter—even though the State proved to you the defendant's guilt beyond a reasonable doubt?

> JUROR ROGERS: I do not believe in capital punishment.

> MR. PIERCE: Let me ask you this question, again, with your answer in mind, please. Would it be impossible to bring in a verdict that required the imposition of the death penalty, no matter what the State showed you, by way of the evidence?

> JUROR ROGERS: I think so.' "

While it is clear that Mrs. Tilgiham, the prospective juror in this case, encountered some difficulty formulating answers to the questions, the solicitor was diligent in seeking to help the juror clarify her position. The solicitor stated that he was seeking by his questions only to find out, under *Witherspoon,* if the juror could or could not render a guilty verdict, the consequences of which would be death to the defendant. We believe the juror clarified her position to the extent that it was clear that she would refuse to return a guilty verdict regardless of the evidence. This is shown by her other answers, as well as by the following exchange:

> "Q. If you were satisfied from the evidence that the defendant was guilty of murder in the first degree, would you vote for a verdict of guilty realizing at the time that it would take his life?

> "A. Well, it would be hard to take a person's life. It would be on my conscience.

"Q. I just want you to tell me if you could or could not do that?

"A. No, I don't feel like I could do that."

As the Texas Court of Criminal Appeals said in *Tezeno:*

"We cannot believe that *Witherspoon* . . . requires certain formal answers and none other. We surely feel that the test of *Witherspoon* is 'not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. [Citation omitted.]' " 484 S.W. 2d at 383.

We think that, reading the juror's answers as a whole, she displayed an unequivocal reluctance to render a guilty verdict, knowing that defendant would be subjected to the death penalty. Furthermore, the record does not disclose that the State had exhausted its nine peremptory challenges, and had this challenge for cause not been sustained, the solicitor could have challenged this juror peremptorily.

This assignment is overruled.

Defendant next contends that the trial court erred in allowing into evidence the defendant's in-custody confession.

A *voir dire* hearing was held to determine the admissibility of the confession. On *voir dire,* Special Agent William Earl Godley of the State Bureau of Investigation testified that he read the defendant his rights at the Murfreesboro Police Station as follows:

"Before I ask you any questions, you must understand your rights. You have the right to remain silent and not make any statement. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before you answer any questions and to have him or anyone else with you during questioning. If you cannot afford a lawyer, one will be appointed for you by the Court before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time until you talk to a lawyer."

Defendant, a high school graduate, testified on *voir dire* that he had been taken into custody three times before and that

State v. Avery

he understood his rights. He signed a written waiver of those rights at about 1:55 a.m. Defendant testified that "nobody mistreated me," that he knew and understood his rights, and that he had a Coca-Cola and was allowed to smoke. After a thorough *voir dire* hearing, covering eleven pages in the record, the trial court concluded that the defendant freely, understandingly and voluntarily made the statement to Sheriff Daniels without undue influence, compulsion and duress and without promise of leniency, and that defendant's constitutional rights had not been abridged in any way. Such conclusions, when supported by competent evidence, are conclusive on appeal. *State v. Thompson,* 285 N.C. 181, 203 S.E. 2d 781 (1974) ; *State v. Crews,* 284 N.C. 427, 201 S.E. 2d 840 (1974) ; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972) ; *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885 (1969).

[2] Defendant earnestly contends, however, that the confession was rendered incompetent due to an incident which occurred between him and Police Chief Wheeler earlier in the evening on 29 September at the police station.

Upon being arrested and placed in the police car around 9:15 p.m., defendant was read his rights. After arriving at the station, defendant asked to make a telephone call. Police Chief Wheeler told defendant he could make the telephone call after he gave the officers his name, date of birth and address. Defendant refused to give that information and was not allowed to make a telephone call at that time. Chief Wheeler testified that he needed the name of the defendant so he could complete his legal papers, draw a warrant promptly (as required by G.S. 15-47), and keep his phone log up to date as required by city regulations. He further testified: "The city requires me to make a log of each call that is made and who makes the call. If he had told me who he was, I would have let him make the call. I did not try to keep him from making the call but I had to know who he was going to call so I could log it." The information sought by Chief Wheeler was harmless to defendant yet necessary to the police in performing clerical duties accompanying arrest.

Later that night Sheriff Daniels of Bertie County took charge of the investigation. Sheriff Daniels recognized defendant as being one of the Avery boys from Lewiston whom he had arrested before. The sheriff was present when defendant

was advised of his rights by Agent Godley and when defendant signed the waiver of those rights. After the waiver was signed, Agent Godley left and Sheriff Daniels, after again reminding defendant of his rights, asked him if it would be all right if he talked to him without a lawyer being present. Defendant replied that this would be all right. Defendant did not request to use the telephone that night although the sheriff told him that there was a telephone available if there was anyone he wanted to call. Under these facts, we do not feel that the refusal of Chief Wheeler to allow defendant to make a phone call until he gave the officer his name, date of birth and address was such prejudicial error, if error, as to require a new trial. Especially so when shortly thereafter, and before making any incriminating statement, defendant was told by the sheriff that a telephone was available if he desired to use it. At that time defendant did not request to make a telephone call but told the sheriff he did not want an attorney or anyone else present at that time and if he decided to get an attorney he would get one himself later on.

Assuming, without deciding, that it was error for Chief Wheeler to refuse to let defendant make the telephone call when he first requested to do so, we believe that under the facts in this case it, at most, would be harmless error. As stated in *State v. Taylor,* 280 N.C. 273, 280, 185 S.E. 2d 677, 682 (1972) :

"Every violation of a constitutional right is not prejudicial. Some constitutional errors are deemed harmless in the setting of a particular case, not requiring the automatic reversal of a conviction, where the appellate court can declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824, 24 A.L.R. 3d 1065 (1967) ; *Harrington v. California,* 395 U.S. 250, 23 L.Ed. 2d 284, 89 S.Ct. 1726 (1969). Unless there is a reasonable possibility that the evidence complained of might have contributed to the conviction, its admission is harmless. *Fahy v. Connecticut,* 375 U.S. 85, 11 L.Ed. 2d 171, 84 S.Ct. 229 (1963)."

In the present case defendant was positively identified by Mrs. Ivy who was present and who was also shot by defendant and who saw defendant shoot deceased. A car was seen leaving the vicinity of the shooting at a high rate of speed shortly after the shooting occurred. Soon thereafter, a car of the same description being driven by the defendant was stopped. A pistol was found in the car with four spent cartridges and two live ones.

Mrs. Ivy testified that three shots were fired after the one which struck her. A ballistics expert testified that the bullets which killed deceased were fired from the pistol found in defendant's possession in the car stolen from Mr. Robertson. Eleven live cartridges for the same caliber pistol and $136 in cash were found in defendant's pockets. A hat similar to the one which defendant had over the pistol when he first entered the store was also found in the car which defendant was driving. In view of this overwhelming evidence of defendant's guilt, we hold that the failure to allow defendant to make the telephone call as first requested, when he was allowed the opportunity to do so shortly thereafter, and before making any incriminating statement, was harmless beyond a reasonable doubt. We do not believe there is a reasonable possibility that this failure contributed to defendant's conviction. *See State v. Castor,* 285 N.C. 286, 204 S.E. 2d 848 (1974) ; *State v. Frank,* 284 N.C. 137, 200 S.E. 2d 169 (1973) ; *State v. Humphrey,* 283 N.C. 570, 196 S.E. 2d 516 (1973).

[3] Defendant next contends that his constitutional and statutory rights were violated by virtue of his being confined in jail for eight days without appointment of counsel.

Defendant was arrested about 9:15 p.m. on 29 September 1973. He was taken to the Murfreesboro Police Department where he signed a written waiver of his rights at about 1:55 a.m. He made a full confession about 3:00 a.m. on 30 September. Counsel was appointed for defendant in District Court on 8 October 1973. Sheriff Daniels testified on *voir dire* that at no time during the week preceding 8 October did defendant request that counsel be appointed for him. Daniels further testified that defendant told him that he could get his own attorney through connections he had in Washington, D. C. Defendant testified on cross-examination during *voir dire* that he told police officers he could get his own attorney and that he did not want appointed counsel. He testified that he told officers this on Monday, Tuesday and Wednesday, following his confession on Sunday morning, and that he was given appointed counsel as soon as he discovered he could not employ his own attorney. This contention is without merit.

Defendant asserts that he was deprived of his constitutional right to the presence of counsel during these eight days, and cites *State v. Hill,* 277 N.C. 547, 178 S.E. 2d 462 (1971), and *State v. Pearce,* 266 N.C. 234, 145 S.E. 2d 918 (1966), in

support of his argument. Defendant's reliance is misplaced. In *Hill*, defendant was held to be unconstitutionally deprived of his right to counsel when his counsel, who had been summoned, was refused permission to see him. In this case, defendant was offered an opportunity to contact counsel, and he assured the officers he would seek his own counsel to assist him. In *Pearce*, defendant was held for two months before counsel was appointed, during which the officers elicited much damaging testimony from him. In that case, lack of presence of counsel was but one factor among several which induced this Court to rule the admissions of defendant to be involuntary. At no time in that case did the defendant assure the officers he would procure his own counsel. In the present case defendant continued to assure the officers that he intended to employ private counsel. Under these circumstances, we hold that defendant's constitutional rights were not violated by the eight days' delay in appointment of counsel.

Defendant contends specifically, however, that his rights under G.S. 7A-453 and G.S. 15-47 were violated by the eight days' delay in appointing counsel for him. Pertinent parts of those statutes are as follows:

"G.S. 7A-453. *Duty of custodian of a possibly indigent person; determination of indigency.—* . . . .

"(b) In districts which do not have a public defender, the authority having custody of a person who is without counsel for more than 48 hours after being taken into custody shall so inform the clerk of superior court. The clerk shall make a preliminary determination as to the person's entitlement to counsel and so inform any district or superior court judge holding court in the county. The judge so informed may assign counsel. The court shall make the final determination.

"(c) In any district, if a defendant, upon being taken into custody, states that he is indigent and desires counsel, the authority having custody shall immediately inform the defender or the clerk of superior court, as the case may be, who shall take action as provided in this section.

"(d) The duties imposed by this section upon authorities having custody of persons who may be indigent are in addition to the duties imposed upon arresting officers under G.S. 15-47."

"G.S. 15-47. *Arresting officer to inform offender of charge, allow bail except in capital cases, and permit communication with counsel or friends.—* . . . [A]nd it shall be the duty of the officer making the arrest to permit the person so arrested to communicate with counsel and friends immediately, and the right of such persons to communicate with counsel and friends shall not be denied." (Repealed by Chapter 1286, Session Laws 1973, effective July 1, 1975.)

In this case, all the evidence is to the effect that defendant told the officers he intended to procure his own attorney through friends in Washington, D. C. He continued to tell the officers this for several days after his arrest. When it first became apparent that he was unable to secure such attorney, an attorney was appointed to represent him without further delay. As stated in *State v. McCloud,* 276 N.C. 518, 531, 173 S.E. 2d 753, 763 (1970):

"The failure to observe the provisions of these statutes may well result in the violation of a person's constitutional rights. However, G.S. 15-46 and G.S. 15-47 do not prescribe mandatory procedures affecting the validity of a trial. *State v. Broome,* 269 N.C. 661, 153 S.E. 2d 384; *Carroll v. Turner,* 262 F. Supp. 486 (E.D.N.C. 1966)."

Defendant, both by words and acts, waived his right to earlier appointment of counsel. No violation of the quoted statutes is shown. This assignment is overruled.

[4] Defendant finally contends that his constitutional and statutory rights were violated by the imposition of the death penalty. The defendant's contentions with respect to the validity of the death sentence have been carefully considered and found to be without merit by this Court in a number of recent decisions. *State v. Noell, supra; State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974); *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). No useful purpose would be served by further discussion here. This assignment is overruled.

In view of the seriousness of the charge and gravity of the punishment imposed, we have carefully examined each of defendant's assignments of error. An examination of the entire record

discloses that the defendant has had a fair trial free from prejudicial error.

No error.

Chief Justice SHARP dissenting as to the death penalty:

The murder for which defendant was convicted occurred on 29 September 1973, a date between 18 January 1973, the day of the decision in *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19, and 8 April 1974, the day on which the General Assembly rewrote G.S. 14-21 by the enactment of Chapter 1201 of the Session Laws of 1973. For the reasons stated by Chief Justice Bobbitt in his dissenting opinion in *State v. Jarrette,* 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974)—an opinion in which Justice Higgins and I joined—, I dissent as to the death sentence imposed upon defendant by the court below and vote to remand for the imposition of a sentence of life imprisonment. *See also* the dissenting opinion of Chief Jusice Bobbitt, and my concurrence therein, in *State v. Waddell, supra* at 453 and 476, 194 S.E. 2d at 30 and 47.

Justice COPELAND dissents as to death sentence and votes to remand for imposition of a sentence of life imprisonment for the reasons stated in his dissenting opinion in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975).

Justice EXUM dissents from that portion of the majority opinion which affirms the death sentence and votes to remand this case in order that a sentence of life imprisonment can be imposed for the reasons stated in his dissenting opinion filed this day in *State v. Williams,* 286 N.C. 422, 212 S.E. 2d 113 (1975), other than those relating to the effect of Section 8 of Chapter 1201 of the 1973 Session Laws.