STATE OF NORTH CAROLINA v. WILLIAM TYNELL WALKER

NO. COA09-977

(Filed 15 June 2010)

1. **Evidence— out-of-court statement—generally consistent with in-court testimony**

   The trial court did not err by allowing an officer to testify concerning an out-of-court statement by a witness in a prosecution that resulted in an assault conviction. Although the out-of-court statement contained information that did not appear in the witness's in-court testimony, the out-of-court statement was generally consistent with her trial testimony. Furthermore, the trial court gave a limiting instruction.

2. **Assault— knife as a deadly weapon—evidence sufficient**

   The defendant introduced sufficient evidence that a knife was a deadly weapon where the record established that the knife wielded by defendant produced wounds to the victim's lip, arm, and back; caused a puncture wound to the victim's lung; resulted

in substantial bleeding; and inflicted injuries requiring significant medical treatment. The fact that the State did not introduce the knife in question did not bar a finding that a deadly weapon was used during the assault.

**3. Assault— serious injury—evidence sufficient**

The trial court did not err by concluding that there was sufficient evidence to permit a jury finding that an assault defendant inflicted a serious injury on the victim.

**4. Appeal and Error— criminal trial—civil judgment recommended—no judgment in record—no appellate jurisdiction**

The Court of Appeals did not have jurisdiction to review a criminal defendant's challenge to the trial court's "recommendation" that a civil judgment be entered for attorney fees for his prior court-appointed counsel where the record on appeal did not contain a civil judgment to that effect.

Appeal by defendant from judgment entered 15 May 2009 by Judge Charles H. Henry in Onslow County Superior Court. Heard in the Court of Appeals 10 December 2009.

*Attorney General Roy Cooper, by Assistant Attorney General Catherine F. Jordan, for the State.*

*Irving Joyner, for Defendant.*

ERVIN, Judge.

Defendant William Tynell Walker appeals from a judgment in which the trial court sentenced Defendant to a minimum of 41 months and a maximum of 59 months imprisonment in the custody of the North Carolina Department of Correction and recommended the entry of a "civil judgment" against Defendant for "prior attorney fees" in the amount of $1,762.50 based on his conviction for assault with a deadly weapon inflicting serious injury. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we find no basis for disturbing Defendant's conviction and conclude that we lack jurisdiction to address Defendant's challenge to the trial court's attorney's fee "recommendation."

STATE v. WALKER

[204 N.C. App. 431 (2010)]

## I. Factual Background

### A. Substantive Facts

Rodney Maurice Sanders, Jr., and Leticia Williams lived together with their child in Jacksonville, North Carolina. On the early afternoon of 24 June 2008, Mr. Sanders was watching television in the bedroom of their home while their child, who was only a baby, was in a crib "[i]n the front room[.]"

According to Ms. Williams, Defendant was her "cousin." However, she had not seen him since "[she] was younger." At around 1:00 p.m., Defendant knocked at the front door of the home occupied by Ms. Williams and Mr. Sanders. After Ms. Williams allowed him to enter, Defendant told Williams that he "wanted to see the baby[.]" In light of that request, Ms. Williams testified that "we sat down [and] played with the baby for a while."

During their conversation, Ms. Williams told Defendant that she and Mr. Sanders had been "arguing[.]" Defendant replied that "he wanted to talk to [Mr. Sanders]." Ms. Williams said Defendant "knocked on the [bedroom] door[,]" which was already broken and not supported by hinges, and "the door fell in." Mr. Sanders "stood up," at which point "they started fighting." Ms. Williams testified that Defendant had a "small" knife in his hand, which was "about three inches" long.

Mr. Sanders testified that Defendant knocked on the bedroom door and that "[he] just remember[ed] the door [to the bedroom] coming down, because it was already broken." Mr. Sanders stood up as soon as the door fell. Defendant and Mr. Sanders "immediately . . . started wrestling around[.]" Mr. Sanders did not have a weapon and did not recall seeing one in Defendant's possession. In the course of the fight, both Mr. Sanders and Defendant fell and a window in the bedroom shattered. Although Mr. Sanders was "cut" during the fight, he did not realize he was injured until the fight was over, when he noticed that he was bleeding.

After the fight ended, Defendant "ran out of the house[.]" Ms. Williams noticed that Mr. Sanders was "bleeding a lot[.]" More particularly, Mr. Sanders was bleeding from his back, his face, and his arm. Mr. Sanders and Ms. Williams called 911, while a neighbor applied pressure to Mr. Sanders' wounds in an attempt to slow the bleeding until emergency medical service personnel arrived and took him to Onslow Memorial Hospital. At the hospital, the examining physician

determined that Mr. Sanders had been "cut" a number of times and had sustained a "puncture wound in [his] lung[.]" For that reason, Mr. Sanders was placed on a ventilator. Although Mr. Sanders thought that he had been stabbed about five times, an examination of photographs taken at the hospital revealed that he had been "stabbed" or cut approximately "eight or nine" times.

Officer Daniel Gallardo of the Jacksonville Police Department was dispatched to the residence occupied by Mr. Sanders and Ms. Williams on 24 June 2008. As Officer Gallardo "walked up to the front door[,]" he "observed the victim lying on the [kitchen]' floor" in pain and "spitting up blood[.]" Officer Gallardo noticed blood in the bathroom, in the kitchen sink, on the kitchen floor, and on the front steps. In addition, Officer Rodney Dorn of the Jacksonville Police Department noticed "a large amount of blood" on the kitchen floor and blood on the bathroom sink, the bathroom walls, and some glass on the bedroom floor.

### B.  Procedural History

On 24 June 2008, a warrant for arrest charging Defendant with assault with a deadly weapon with intent to kill inflicting serious injury and attempted murder was issued by Magistrate Christopher T. Riggs. On 7 April 2009, the Onslow County grand jury returned a bill of indictment charging Defendant with attempted murder and assault with a deadly weapon with intent to kill inflicting serious injury. The charges against Defendant came on for trial before the trial court and a jury at the 11 May 2009 criminal session of the Onslow County Superior Court. After the presentation of the State's evidence and after Defendant elected to rest without presenting any evidence, the trial court allowed Defendant's motion to dismiss the attempted murder charge and concluded that the evidence was insufficient to support a finding that Defendant acted with the intent to kill.[1] On 13 May 2009, a jury returned a verdict finding Defendant guilty of assault with a deadly weapon inflicting serious injury. At the ensuing sentencing hearing, the trial court found that Defendant should be sentenced as a Level IV offender and ordered that Defendant be imprisoned in the custody of the North Carolina Department of Correction for a minimum term of 41 months and a maximum term of 59 months. In addition, the trial court's judgment "recommends" the

---

1. Although the record does not contain any additional information relating to such a charge, at the conclusion of all of the evidence the trial court also dismissed a felonious breaking or entering charge that had apparently been lodged against Defendant.

entry of a "civil judgment" for "prior attorney fees" in the amount of $1,762.50. Defendant noted an appeal to this Court from the trial court's judgment.

## II. Legal Analysis

## A. Admission of Prior Statement

**[1]** First, Defendant contends that the trial court erred by allowing Officer Dorn to testify concerning an out-of-court statement made by Ms. Williams. In essence, Defendant argues that the trial court's ruling contravened N.C. Gen. Stat. § 8C-1, Rule 607, by allowing the State to impeach Ms. Williams through the introduction of prior inconsistent statements into evidence despite the fact that those statements were "collateral" testimony rendered inadmissible by virtue of decisions such as *State v. Hunt*, 324 N.C. 343, 348, 378 S.E.2d 754, 757 (1989) (stating "that cross-examination of a party's own witness [is] governed by the same rules that govern the cross-examination of witnesses called by the opposing party[,]" including "the rule that extrinsic evidence of prior inconsistent statements may not be used to impeach a witness where the questions concern" collateral issues). We disagree.

"Prior consistent statements of a witness are admissible for purposes of corroboration even if the witness has not been impeached." *State v. Swindler*, 129 N.C. App. 1, 4, 497 S.E.2d 318, 320, *aff'd*, 349 N.C. 347, 507 S.E.2d 284 (1998), (citing *State v. Riddle*, 316 N.C. 152, 157, 340 S.E.2d 75, 78 (1986)). "When so offered, evidence of a prior consistent statement must in fact corroborate a witness's later testimony[;] [h]owever, there is no requirement that the rendition of a prior consistent statement be identical to the witness's later testimony." *Swindler*, 129 N.C. App. at 5, 497 S.E.2d at 320. " '[S]light variances in the corroborative testimony do not render it inadmissible.' " *Id.* (quoting *State v. Covington*, 290 N.C. 313, 337, 226 S.E.2d 629, 646 (1976)). "In order to be corroborative and therefore properly admissible, the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight or credibility to such testimony." *State v. Ramey*, 318 N.C. 457, 469, 349 S.E.2d 566, 573 (1986) (citing *Riddle*, 316 N.C. at 156-57, 340 S.E.2d at 77-78; *State v. Higgenbottom*, 312 N.C. 760, 768-69, 324 S.E.2d 834, 840 (1985); *State v. Burns*, 307 N.C. 224, 231, 297 S.E.2d 384, 388 (1982); *State v. Ollis*, 318 N.C. 370, 348 S.E.2d 777 (1986)).

In order to be admissible as corroborative evidence, a witness' prior consistent statements merely must tend to add weight or credibility to the witness' testimony. Further, it is well established that such corroborative evidence may contain new or additional facts when it tends to strengthen and add credibility to the testimony which it corroborates.

*State v. Walters*, 357 N.C. 68, 89, 588 S.E.2d 344, 356, *cert. denied*, 540 U.S. 971, 157 L. Ed. 2d 320 (2003) (quoting *State v. Farmer*, 333 N.C. 172, 192, 424 S.E.2d 120, 131 (1993) (internal citations omitted)). "Moreover, 'if the previous statements are generally consistent with the witness' testimony, slight variations will not render the statements inadmissible, but such variations . . . affect [only] the credibility of the statement.' " *Walters*, 357 N.C. at 89, 588 S.E.2d at 356 (quoting *State v. Martin*, 309 N.C. 465, 476, 308 S.E.2d 277, 284 (1983)). On the other hand, "the witness's prior statements as to facts not referred to in his trial testimony and *not tending to add weight or credibility* to it are not admissible as corroborative evidence[;] [a]dditionally, the witness's prior contradictory statements may not be admitted under the guise of corroborating his testimony." *Ramey*, 318 N.C. at 469, 349 S.E.2d at 573 (emphasis in original). "A trial court's determination that evidence is admissible as corroborative evidence is reviewed for abuse of discretion." *State v. Cook*, —— N.C. App. ——, ——, 672 S.E.2d 25, 33 (2009) (citing *Covington*, 290 N.C. at 337, 226 S.E.2d at 645-46).

At trial, Ms. Williams testified on direct examination as follows:

Q: . . . Had [Defendant] been to your house before June 24th?

A: Not that I remember.

. . . .

Q: . . . Did you talk to him at the door, or did you step out on the porch?

A: I stepped out on the porch, at first, and then I let him in, after.

Q: Why did you let [Defendant] in?

A: Because he wanted to see the baby, for one, and I had already been talking to him, because I was telling him about me and my boyfriend . . . arguing, and he just wanted—he said he wanted to talk to [Mr. Sanders].   .

. . . .

Q: Where was Mr. Sanders, at this time?

A: Sitting down in the [bed]room.

. . . .

Q: Now, when you answered the door, did you have the baby in your arms?

A: Yes.

. . . .

Q: What did [Defendant] do, once you got inside?

A: Well, . . . I started to tell him about me and [Mr. Sanders] arguing, and he asked me why [we were] arguing, and I told him about it. And then—so he knocked on—he said that he wanted to talk to [Mr. Sanders], and he knocked on—so I told him [Mr. Sanders] was in the [bed]room. He knocked on the door and the door fell in.

Q: What did he do, once the door fell in?

A: . . . [W]ell, I put the baby in the crib, and [Mr. Sanders] stood up and he walked towards [Defendant]. [Defendant] walked towards [Mr. Sanders], and then they started fighting.

. . . .

Q: Why did you go in the room?

A: Because they were fighting, and I was trying to break it up.

Q: Why were you trying to break it up?

A: Because they were fighting. I'm not going to let them fight.

. . . .

Q: Did you see [Defendant] with a knife?

A: After—after they were already by the window, after they had been fighting for a while.

Q: Where did he have the knife?

A: I don't remember.

Q: Was it in his hand?

A: Yeah.

Q: What was your feeling when you saw [Defendant] with a knife?

A: I just ran over there to try to stop both of them.

Q: Did you try to get in between them?

A: Yes.

Q: Did you try to grab the knife from [Defendant]?

A: No, because I couldn't think straight at the time.

Q: Why couldn't you think straight?

A: Because there was a lot of stuff going on.

Q: Did you see [Defendant] stab Mr. Sanders?

A: I don't remember. I just saw the knife, but I don't remember because, like I said, I couldn't think straight. There was a lot of stuff going on.

After the prosecutor refreshed Ms. Williams' recollection by showing Ms. Williams her written statement, Ms. Williams testified that:

Q: All right. Now, did you see [Defendant] stab Mr. Sanders?

A: I still don't remember. I guess so, but I don't remember.

Q: Did you write down that you saw that?

A: Yes, I wrote it.

Following a bench conference, the trial court gave the following limiting instruction to the jury concerning the purposes for which Ms. Williams' prior statement could be considered:

Okay. Ladies and gentlemen of the jury, when evidence has been received tending to show that, at an earlier time, the witness, Leticia Williams, made a statement which may be consistent with or may conflict with her testimony at this trial, you must not consider the earlier statement as evidence of the truth of what was said at that earlier time because it was not made under oath at this trial. If you believe that such earlier statement was made to this witness or this officer and that it is consistent or does conflict with the testimony of Leticia Williams at this trial, then you may consider this, together with all other facts and circumstances, bearing upon Leticia Williams' truthfulness in deciding whether you'll believe or disbelieve that witness' testimony at this trial.

After the trial court's limiting instruction, Officer Dorn testi-fied that:

[Ms. Williams] stated that the Friday previous to the incident, which would have been June 20th, that a black male came to her residence with her godmother, Darlene Jackson, and that they had come to speak with her, as well as her boyfriend, Mr. Sanders, about problems they were having in their relationship; however, Ms. Williams was not home on this evening. So she stated that her godmother, Ms. Jackson, as well as the individual she only knew as Bill, a black male, had a conversation with Mr. Sanders at the residence, in her absence.

She then stated that, on this day the incident occurred, which was June 24th, that [Defendant] returned to the residence and informed her that he had just stopped by to check on her. She stated that they were having this conversation on the deck and that, while having this conversation, she asked the subject, [De-fendant], for some—if she could borrow a few dollars because Mr. Sanders had just used the last bit of her money to pay a bill.

She said, at that time, that the individual, [Defendant], asked where Mr. Sanders was, and she advised him that he was inside, watching TV. During this conversation, she stated that she asked [Defendant] why he was inquiring, and if [Mr. Sanders] needed to come out and talk to him, and he said no. She stated that she again asked why he was inquiring about Mr. Sanders' where-abouts, and that he told her not to worry about it.

Ms. Williams told me, at that time, that she was holding her daughter while standing there, talking to the subject that she referred to as [Defendant], when that subject pushed her out of the way and ran into the residence. She stated the subject knocked down the door to Mr. Sanders' bedroom and a fight ensued. She could hear a scuffle. She stated that she set her daughter down and ran inside to find out what was taking place in the bedroom, at which time she saw the subjects fighting.

She said she could see [Defendant] making stabbing motions at [Mr. Sanders'] back, and she saw a pocket knife and attempted to stop [Defendant]. She said, at that time, [Defendant] reportedly told Ms. Williams to get the F off of her, the word—I'll spare you from the language—and she was unable to break them up. She said shortly after that, that [Defendant] fled and left the residence on foot, and that she attempted to stop the bleeding because Mr.

Sanders was having problems breathing and she ran next door to call for help.

Despite the fact that Ms. Williams' out-of-court statement[2] to Officer Dorn contained information that did not appear in her in-court testimony, her out-of-court statement was generally consistent with the account of the events that occurred on 24 June 2008 that she gave at trial. Although Ms. Williams' out-of-court statement included the statement that Defendant had come to her house on the preceding Friday with her godmother and that she had seen Defendant stabbing Mr. Sanders and although Ms. Williams disclaimed any memory of having seen Defendant at her residence prior to 24 June 2008 or the actual stabbing in her trial testimony, Ms. Williams did not directly deny that she had seen Defendant prior to 24 June 2008 or that she had seen Defendant stabbing Mr. Sanders in her trial testimony. Instead, she simply said that she did not remember either of those events occurring. Furthermore, she did explicitly testify that she had seen Defendant with a knife during his attack on Mr. Sanders. At bottom, Ms. Williams' trial testimony constituted a description, albeit a less-complete one, of the same events described in her out-of-court statement, a fact which means that her out-of-court statement tended to add weight and credibility to her trial testimony despite the fact that she denied any memory of certain events that she described in her out-of-court statement. Furthermore, the trial court gave a limiting instruction that informed the jury that it was only permitted to consider Ms. Williams' out-of-court statements for the purpose of evaluating her credibility and not for substantive purposes, thus ensuring that Defendant would not be prejudiced by the variations between Ms. Williams' trial testimony and her statement to Officer Dorn. *See State v. Harris*, 189 N.C. App. 49, 57, 657 S.E.2d 701, 707, *disc. review denied*, 362 N.C. 366, 664 S.E.2d 315 (2008). As a result, we believe that Ms. Williams' out-of-court statement was properly admitted for corroborative purposes and that the trial court, by delivering a limiting instruction that has not been challenged on appeal, acted to ensure that the jury only considered that statement for the non-hearsay purpose of evaluating the credibility of Ms. Williams' trial testimony.

Although Defendant views the relevant legal issues through an entirely different lens, we are not persuaded that Defendant's ap-

2. The statement that Officer Dorn testified to at trial was a different statement than the written statement that was shown to Ms. Williams on direct examination in an attempt to refresh her recollection.

proach is correct. In order to adopt Defendant's approach, we would first have to conclude that the State introduced the out-of-court statement that Ms. Williams gave to Officer Dorn for the purpose of impeaching her testimony. Despite Defendant's repeated insistence that the State's real motive for introducing Ms. Williams' out-of-court statement was impeachment rather than corroboration, we are not, based on our review of the record, persuaded by his contention.[3] In addition, Defendant argues that "[j]urors were presented with two different versions of the events of" 24 June 2008," one of which was contained "in [Ms.] Williams' trial testimony" and the "other [of which] was presented in the hearsay statements which were presented by [Officer] Dorn for the sole purpose of undermining [Ms.] Williams' credibility," and that "[t]he jurors chose to accept [Officer] Dorn's testimony regarding the out-of-court statements allegedly made by [Ms.] Williams as the correct version of what happened on" 24 June 2008. We are not persuaded by this component of Defendant's argument, which assumes that the jury used Ms. Williams' out-of-court statement for substantive purposes, either, since the trial court's limiting instruction clearly prohibited the jury from using Ms. Williams' out-of-court statement in that manner,[4] see Harris, 189

---

3. The State might well have been authorized to use Ms. Williams' out-of-court statement for impeachment purposes without confronting her with the statement described by Officer Dorn given that the extent to which she actually saw Defendant stabbing Mr. Sanders went to a material issue in the case. *State v. Mack*, 282 N.C. 334, 340, 193 S.E.2d 71, 75 (1972) (stating that "[w]hether a foundation must be laid before a prior inconsistent statement may be shown depends on whether the prior inconsistency relates to *a matter pertinent and material to the pending inquiry,* or is merely *collateral*[;]" "[i]f the former, the statement may be shown by other witnesses without the necessity of first laying a foundation therefor by cross-examination") (emphasis in the original) (citing *State v. Wellmon*, 222 N.C. 215, 22 S.E.2d 437 (1942); *State v. Carden*, 209 N.C. 404, 183 S.E. 898 (1936); *Jones v. Jones*, 80 N.C. 246 (1879); *State v. Patterson*, 24 N.C. 346 (1842); Stansbury, N.C. Evidence § 48 (2d ed. 1963). The decisions upon which Defendant relies, such as *Hunt*, 324 N.C. at 348, 378 S.E.2d at 759; *State v. Williams*, 322 N.C. 452, 455, 368 S.E.2d 624, 626 (1988); and *State v. Jerrells*, 98 N.C. App. 318, 321, 390 S.E.2d 722, 724 (1990), are "inapposite" because the collateral matter at issue in those decisions was whether the defendant made the statement with which the State sought to impeach the defendant. *State v. Ricard*, 142 N.C. App. 298, 302-03, 542 S.E.2d 320, 323 (2001). However, since Ms. Williams was called to testify by the State and since the record does not establish that the prerequisites that must be met in order for the State to be allowed to impeach its own witness as set out in *Hunt*, 324 N.C. at 349, 378 S.E.2d at 757, have been met, we do not believe that we have sufficient basis for concluding that the State had the right to impeach Ms. Williams' testimony at Defendant's trial.

4. As we noted in our discussion of the extent to which Ms. Williams' out-of-court statement corroborated her trial testimony, we are not convinced that there is any material difference between the description of the events that occurred on 24 June 2008 in Ms. Williams' trial testimony and in her out-of-court statement. Although Ms.

N.C. App. at 57, 657 S.E.2d at 707 (stating that, "[a]dmittedly, portions of [the witness's] out-of-court statements to [the officer] contained information that [the witness] did not include in her in-court testimony[;] [h]owever, the differences between [the witness's] in-court and out-of-court statements are not contradictory[;] [r]ather, [the witness's] trial testimony was simply a less-complete statement of the events than her out-of-court statement to [the officer]"). We also note that it is presumed that the jury followed the trial court's instructions. *State v. Trull*, 349 N.C. 428, 455, 509 S.E.2d 178, 196 (1998) (stating that "jurors are presumed to pay close attention to the particular language of the judge's instructions in a criminal case . . . and [to] follow the instructions as given"). As a result, for the reasons stated above, we conclude that this case does not involve the improper admission of a prior inconsistent statement in violation of N.C. Gen. Stat. § 8C-1, Rule 607; that the present issue is more appropriately addressed under the rules applicable to the admission of corroborative testimony; and that the trial court did not abuse its discretion by allowing the admission of Officer Dorn's testimony for the purpose of corroborating Ms. Williams' trial testimony.

### B.  Motion to Dismiss

Secondly, Defendant contends that the trial court erred by failing to dismiss the charge of assault with a deadly weapon inflicting serious injury for insufficiency of the evidence. More specifically, Defendant contends that there is insufficient evidence to establish that he used a "deadly weapon" during his assault on Mr. Sanders and that Mr. Sanders sustained a "serious injury." We disagree.

### 1.  Standard of Review

N.C. Gen. Stat. § 14-32(b) provides that "[a]ny person who assaults another person with a deadly weapon and inflicts serious injury shall be punished as a Class E felon." N.C. Gen. Stat. § 14-32(b). " 'The elements of a charge under [N.C. Gen. Stat.] § 14-32(b) are (1)

---

Williams explicitly stated that she saw Defendant stabbing Mr. Sanders in her out-of-court statement and not in her trial testimony, she clearly stated that she saw Defendant with a knife during his assault on Mr. Sanders. In addition, while Defendant suggests in his brief that Mr. Sanders' injuries could have come from falling on glass that came from the broken bedroom window, the number of wounds sustained by Mr. Sanders, the distribution of the wounds on Mr. Sanders' body, and the fact that one of them punctured his lung poses certain problems for Defendant's argument. Thus, while we need not reach the issue of prejudice in order to address Defendant's challenge to the trial court's ruling, a legitimate argument can be made that there is no reasonable possibility that the outcome would have been different had the trial court not allowed the admission of Ms. Williams' out-of-court statement.

an assault (2) with a deadly weapon (3) inflicting serious injury (4) not resulting in death.' " *State v. Ryder*, —— N.C. App. ——, ——, 674 S.E.2d 805, 812 (2009) (quoting *State v. Aytche*, 98 N.C. App. 358, 366, 391 S.E.2d 43, 47 (1990)).

When reviewing a challenge to the denial of a defendant's motion to dismiss a charge on the basis of insufficiency of the evidence, this Court determines "whether the State presented 'substantial evidence' in support of each element of the charged offense." *State v. Chapman*, 359 N.C. 328, 374, 611 S.E.2d 794, 827 (2005)). " 'Substantial evidence' is relevant evidence that a reasonable person might accept as adequate, or would consider necessary to support a particular conclusion." *State v. Abshire*, 363 N.C. 322, 328, 677 S.E.2d 444, 449 (2009) (quoting *State v. McNeil*, 359 N.C. 800, 804, 617 S.E.2d 271, 274 (2005)). "In this determination, all evidence is considered 'in the light most favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence.' " *Id.* (citation omitted). "The defendant's evidence, unless favorable to the State, is not to be taken into consideration," *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971), except that, "when it is consistent with the State's evidence, the defendant's evidence 'may be used to explain or clarify that offered by the State.' " *State v. Denny*, 361 N.C. 662, 665, 652 S.E.2d 212, 213 (2007) (quoting *Jones*, 280 N.C. at 66, 184 S.E.2d at 866 (citation omitted)). Additionally, a " 'substantial evidence' inquiry examines the sufficiency of the evidence presented but not its weight," which remains a matter for the jury. *McNeil*, 359 N.C. at 804, 617 S.E.2d at 274 (citation omitted). Thus, "if there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *Id.* (citation omitted).

### 2. Deadly Weapon

[2] On appeal, Defendant contends that, because the State did not introduce the knife into evidence at trial and because Mr. Sanders' injuries could have been caused by glass stemming from the broken window, the State failed to elicit sufficient evidence to support a finding that Defendant employed a deadly weapon. However, after carefully examining the record in light of the applicable law, we conclude that Defendant's argument is not persuasive.

At trial, Ms. Williams testified that Defendant held a knife in his hand during his fight with Mr. Sanders. According to Ms. Williams, the

knife was approximately three inches long. Ms. Williams also testified that Mr. Sanders bled "a lot" from his wounds, having dripped blood throughout the residence. Officer Gallardo "observed the victim lying on the floor" in pain and "spitting up blood[.]" Officer Dorn stated that there was blood in the bedroom, bathroom and kitchen of the home. Mr. Sanders testified that he was stabbed or cut eight or nine times and had wounds on his lip, his back, and his arm. Mr. Sanders was removed from his residence "on a stretcher" and remained in the emergency room for twelve hours, during which time he received a "chest tube" to "drain blood[,]" stitches in his back and arm, and was placed on a "ventilator" as a result of a "puncture wound in [his] lung[.]" Mr. Sanders also received "[p]ain medication" for approximately one week. At the trial approximately two years after the incident, Mr. Sanders still had visible scars on his lip, arm, and back.

A deadly weapon is one which, under the circumstances of its use, is likely to cause death or great bodily harm. *State v. Strickland*, 290 N.C. 169, 178, 225 S.E.2d 531, 538 (1976). "The definition of a deadly weapon clearly encompasses a wide variety of knives[;] [f]or instance, a hunting knife, a kitchen knife and a steak knife have been denominated deadly weapons *per se*." *State v. Sturdivant*, 304 N.C. 293, 301, 283 S.E.2d 719, 726 (1981). "A pocketknife is also unquestionably capable of causing serious bodily injury or death[,] [and] [i]n *State v. Collins*, the Court opined that a pocketknife, having a blade two and a half inches long, was a deadly weapon as a matter of law." *Sturdivant*, 304 N.C. at 301, 283 S.E.2d at 726 (citing *State v. Collins*, 30 N.C. 407, 409, 412 (1848)). Similarly, a knife with a three-inch blade constitutes a deadly weapon *per se* when used as a weapon in an assault. *State v. Cox*, 11 N.C. App. 377, 380, 181 S.E.2d 205, 207 (1971). "Nevertheless, the evidence in each case determines whether a certain kind of knife is properly characterized as a lethal device as a matter of law or whether its nature and manner of use merely raises a factual issue about its potential for producing death." *Sturdivant*, 304 N.C. at 301, 283 S.E.2d at 726. "The deadly character of the weapon depends sometimes more upon the manner of its use, and the condition of the person assaulted, than upon the intrinsic character of the weapon itself." *State v. Smith*, 187 N.C. 469, 470, 121 S.E. 737, 737 (1924) (citations omitted). "No item, no matter how small or commonplace, can be safely disregarded for its capacity to cause serious bodily injury or death when it is wielded with the requisite evil intent and force." *Sturdivant*, 304 N.C. at 301 n.2, 283 S.E.2d at 725 n.2 (citations omitted).

Defendant's challenge to the trial court's ruling with respect to the sufficiency of the evidence that he assaulted Mr. Sanders with a deadly weapon fails for several reasons. First, the Supreme Court has stated that "[w]e know of no rule of law . . . that requires the production of the alleged deadly weapon on the trial of a criminal prosecution for an assault with a deadly weapon[;]" "[i]ndeed, this Court recognizes that the weapon may not be produced." *State v. Randolph*, 228 N.C. 228, 231, 45 S.E.2d 132, 135 (1947). Thus, the fact that the State did not introduce the knife in question does not bar a finding that a deadly weapon was used during the assault. Secondly, this Court has previously held that a three-inch knife, when used in an assault, is a deadly weapon *per se*. *Cox*, 11 N.C. App. at 380, 181 S.E.2d at 207. Finally, the record supports a finding that the knife in question was a deadly weapon based on the effects resulting from its use. In *Sturdivant*, 304 N.C. at 302, 283 S.E.2d at 726, the Supreme Court stated that:

> Defendant contends that the evidence was insufficient for the court to do so since the knife itself was not offered into evidence, and the victim failed to describe the length of the knife's blade. We disagree. The absence of such evidence was indeed a factor to be considered by the jury in its evaluation of the overall weight and worth of the State's case on this point. The omission was not, however, fatal as the State presented other evidence which permitted a rational trier of fact to conclude that the pocketknife was a deadly weapon. The victim's uncontroverted testimony revealed that, prior to the kidnapping and rape, defendant had used the pocketknife to open a can of oil. He later used this same knife to cut off the victim's slip. Defendant was a large man, approximately six feet tall and over 250 pounds. We believe that a knife sturdy enough to open a metal oil can and sharp enough to slash a piece of clothing could surely cause death or great bodily harm when wielded by a man of defendant's physical stature.

Similarly, in *State v. McCoy*, 174 N.C. App. 105, 114, 620 S.E.2d 863, 870 (2005), this Court opined that:

> The State's evidence, including the documents from the domestic violence hearing which were admitted as substantive evidence, tended to show that the defendant stabbed Hunt five times with a knife causing wounds still visible some eight weeks after the assault. This evidence could adequately support an inference by the jury that the defendant assaulted Hunt with a deadly weapon.

As a result, it is clear that well-established principles of North Carolina law allow the extent to which a particular instrument is a deadly weapon to be inferred based on the effects resulting from the use made of that instrument. In this case, the record establishes that the knife wielded by Defendant produced wounds to Mr. Sanders' lip, arm, and back; caused a puncture wound to Mr. Sanders' lung; resulted in substantial bleeding; and inflicted injuries requiring significant medical treatment. The injuries produced by the knife at issue in this case are at least as significant as the effects deemed sufficient to support a finding that a knife was a deadly weapon in *Sturdivant* and *McCoy*. As a result, for all of these reasons, we conclude that the trial court did not err by concluding that the record contained sufficient evidence to support a finding that Defendant used a deadly weapon at the time that he assaulted Mr. Sanders.

### 3.  Serious Injury ·

**[3]** In addition, Defendant challenges the trial court's refusal to grant his motion to dismiss predicated on the alleged absence of sufficient evidence that Mr. Sanders sustained a "serious injury" as a result of the assault committed by Defendant. In challenging the trial court's ruling, Defendant notes that "[t]here was no medical or expert testimony regarding the gravity of [Mr. Sanders'] injury[,] nor did [Mr.] Sanders testify that he experienced any pain and/or suffering." Once again, we do not find Defendant's challenge to the trial court's ruling persuasive.

"[T]he serious injury element of [N.C. Gen. Stat.] § 14-32" means "a physical or bodily injury." *State v. Everhardt*, 326 N.C. 777, 780, 392 S.E.2d 391, 392 (1990). "The courts of this [S]tate have declined to define serious injury for purposes of assault prosecutions other than stating that the term means physical or bodily injury resulting from an assault, and that 'further definition seems neither wise nor desirable.' " *State v. Morgan*, 164 N.C. App. 298, 303, 595 S.E.2d 804, 808-09 (2004). "Whether a serious injury has been inflicted is a factual determination within the province of the jury." *Morgan*, 164 N.C. App. at 303, 595 S.E.2d at 808-09. Among the factors that have been deemed relevant in determining whether serious injury has been inflicted are: (1) pain and suffering; (2) loss of blood; (3) hospitalization; and (4) time lost from work. *Id.* Evidence of hospitalization is not, however, necessary for proof of serious injury. *Id.* The "[c]ases that have addressed the issue of the sufficiency of evidence of serious injury appear to stand for the proposition that as long as the State

presents evidence that the victim sustained a physical injury as a result of an assault by the defendant, it is for the jury to determine the question of whether the injury was serious." *State v. Alexander*, 337 N.C. 182, 189, 446 S.E.2d 83, 87 (1994).

As we have previously noted, the evidence tends to show that Defendant held a three-inch knife during his assault on Mr. Sanders; that Mr. Sanders bled "a lot" from his wounds; that Mr. Sanders dripped blood throughout the residence; that there was blood in the bedroom, bathroom, and kitchen; and that Mr. Sanders was "lying on the floor" in pain and "spitting up blood" when Officer Gallardo arrived. Mr. Sanders testified that he was stabbed or cut eight or nine times and that he had wounds on his lip, his back, and his arm. Mr. Sanders was taken from his residence "on a stretcher" and transported to the emergency room, where he remained for twelve hours. While in the emergency room, Mr. Sanders received a "chest tube" to "drain blood[,]" stitches in his back and arm, and was placed on a "ventilator" as a result of a "puncture wound in [his] lung[.]" Mr. Sanders received "[p]ain medication" for approximately one week. At the trial, which was held approximately two years after the assault, Mr. Sanders still had visible scars on his lip, arm, and back.

As this summary indicates, the record does contain evidence addressing several of the "[r]elevant factors in determining whether serious injury has been inflicted[,]" including "(1) pain and suffering; (2) loss of blood; (3) hospitalization[.]" *Morgan*, 164 N.C. App. at 303, 595 S.E.2d at 808-09. In addition, the record establishes that Mr. Sanders received multiple stab wounds, sustained a punctured lung, had to be taken to the emergency room by emergency medical service personnel rather than getting himself there under his own power, and continued to show signs of injury some two years after the assault. As a result, we are unable to agree with Defendant's contention that "there was nothing in the State's evidence [that] would satisfy" the "great pain and suffering" standard and conclude that the State presented "evidence that the victim sustained a physical injury as a result of an assault by the defendant," so that "it [was] for the jury to determine the question of whether the injury was serious." *Alexander*, 337 N.C. at 189, 446 S.E.2d at 87. Thus, the trial court did not err by concluding that the record contained sufficient evidence to permit a jury finding that Defendant inflicted "serious injury" upon Mr. Sanders.

## C. Judgment for Attorney's Fees

[4] Finally, Defendant contends that the trial court erred by ordering him to pay restitution in the amount of $1,762.50 relating to the cost of his prior court-appointed counsel. According to Defendant, the trial court erred in requiring Defendant to pay restitution in this amount because "[t]here was absolutely no evidence presented . . . to support this order." After reviewing the record in light of the applicable law, we conclude that we lack jurisdiction to consider Defendant's challenge to this provision of the trial court's judgment.

The judgment entered against Defendant in this case "recommends" the entry of a "CIVIL JUDGMENT PRIOR ATTORNEY FEES $1,762.50." The trial court noted on the judgment immediately below the provision that is the subject of Defendant's challenge that "[a] hearing was held in open court in the presence of the defendant at which time a fee, including expenses, was awarded the defendant's appointed counsel or assigned public defender." However, the record does not contain a civil judgment in which Defendant is ordered to pay the cost of his court-appointed counsel in any amount.

According to well-established principles of North Carolina law, "the amount of restitution recommended by the trial court must be supported by evidence adduced at trial or at sentencing." *State v. Wilson*, 340 N.C. 720, 726, 459 S.E.2d 192, 196 (1995) (citing *State v. Daye*, 78 N.C. App. 753, 756, 338 S.E.2d 557, 560, *aff'd per curiam*, 318 N.C. 502, 349 S.E.2d 576 (1986)). Although the decisions of this Court and the Supreme Court establish that trial judges lack the authority to require or recommend the payment of restitution in the absence of sufficient evidence to support an award of restitution in the amount deemed appropriate, we do not believe that those decisions provide the appropriate yardstick by which to evaluate the lawfulness of the challenged provision of the present judgment. Instead, we believe that the present issue must be resolved based on the decisions of the Supreme Court and this Court concerning the recoupment of payments to court-appointed counsel from indigent defendants.

The State is reimbursed for payments made to court-appointed counsel by indigent defendants pursuant to the procedures outlined in N.C. Gen. Stat. § 7A-455 *et seq.* According to N.C. Gen. Stat. § 7A-455(b), "[i]n all cases the court shall direct that a judgment be entered in the office of the clerk of superior court for the money value of services rendered by assigned counsel[,] . . . which shall con-

stitute a lien as prescribed by the general law of the State applicable to judgments."

> The [S]tate assumes the status of a judgment lien creditor against the assets of an indigent defendant who has accepted court-appointed counsel and been found guilty of the offense. The lien is not valid unless the indigent defendant was given both notice of the [S]tate's claim and the opportunity to resist its perfection in a hearing before the trial court. The lien is collectable through normal civil debt recovery procedures, but those assets and wages of the indigent necessary for his own or his family's support and existence are not subject to garnishment or attachment.

*Alexander v. Johnson*, 742 F.2d 117, 120, n.5 (4th Cir. 1984) (citing N.C. Gen. Stat. §§ 1-362, 1C-1601; *State v. Crews*, 284 N.C. 427, 201 S.E.2d 840, 849 (1974); *State v. Stafford*, 45 N.C. App. 297, 262 S.E.2d 695, 697 (1980)).

In *Crews*, the Supreme Court vacated a judgment entered against an indigent defendant for the cost of court-appointed counsel on the basis of the following logic:

> [D]efendant asserts that "[t]he court erred in entering an order and judgment against defendant for payment of counsel fees, said order appearing on page 9 of the petition for certiorari, dated February 16, 1973 and signed by Lupton, Judge." . . . There appears in the record a judgment dated 16 February 1973 signed by Judge Lupton. This judgment provides for the recovery by the State of North Carolina from defendant of the sum of $1,000.00 for services provided defendant as an indigent by the Public Defender. Presumably this judgment was entered pursuant to [N.C. Gen. Stat. §] 7A-455(b).

> In his brief, defendant attacks this judgment on the following grounds: He asserts it was entered in his absence, without notice to him of any hearing with reference thereto, and without affording him any opportunity to be heard in connection therewith. He asserts further "that the judgment is in the nature of a civil judgment and there were not findings of fact nor conclusions of law sufficient to support such judgment pursuant to Rule 52 of the North Carolina Rules of Civil Procedure.["]

> The record before us affords no basis for passing upon the validity of this judgment. Nothing therein supports or negates defendant's contentions. Under the circumstances, this Court, in

the exercise of its supervisory jurisdiction, vacates this civil judgment without prejudice to the State's right to apply for a judgment in accordance with [N.C. Gen. Stat. §] 7A-455 after due notice to defendant and a hearing on such application in the Superior Court of Guilford County.

*Crews*, 284 N.C. at 441-42, 201 S.E.2d at 849-50; *see also State v. Jacobs*, 361 N.C. 565, 566, 648 S.E.2d 841, 842 (2007) (concluding that "because there is no civil judgment in the record ordering defendant to pay attorney fees, the Court of Appeals had no subject matter jurisdiction on this issue"); *Stafford*, 45 N.C. App. at 300, 262 S.E.2d at 697 (stating that N.C. Gen. Stat. § 7A-455(b) "allows the court to enter a civil judgment against a convicted indigent for attorney's fees and costs[,]" while vacating the civil judgment against the defendant because "there appears no indication that defendant received any opportunity to be heard on the matter"). As a result, a civil judgment entered against a convicted criminal defendant for the cost of court-appointed counsel lacks validity in the event that the defendant did not have a reasonable opportunity to be heard. However, the record on appeal submitted in connection with any appellate challenge to the validity of such a civil judgment must contain the civil judgment which the defendant seeks to challenge in order for the appellate court to have jurisdiction over the defendant's claim.

Aside from the fact that Defendant makes no contention that he had no opportunity to be heard with respect to the amount of attorney's fees awarded to his "prior" counsel, the absence of a civil judgment reflecting the trial court's "recommendation" that such a judgment be entered relating to the fees awarded to Defendant's prior court-appointed counsel deprives us of jurisdiction to review the challenged provision of the trial court's judgment. *Jacobs*, 361 N.C. at 566, 648 S.E.2d 842. Such a ruling is consistent with considerations of sound appellate procedure, since proceeding to rule on Defendant's challenge would put us in the position of evaluating the validity of a judgment that might, for all we know, have never been entered. Thus, we decline to entertain Defendant's challenge to the provision of the trial court's judgment "recommending" that a civil judgment be entered for the attorney's fees awarded to Defendant's prior court-appointed counsel.

### III. Conclusion

As a result, we conclude that Defendant had a fair trial that was free from prejudicial error and that we have no jurisdiction to enter-

tain Defendant's challenge to the trial court's "recommendation" that a civil judgment be entered in the amount of the attorney's fees awarded to Defendant's prior court-appointed counsel. For this reason, we decline to grant Defendant's request for appellate relief from the trial court's judgment.

NO ERROR.

Judges STROUD and HUNTER, JR. concur.