IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-68

Filed 21 November 2023

Forsyth County, No. 21 CRS 55564

STATE OF NORTH CAROLINA

v.

JUDY WEBSTER

Appeal by defendant from judgment entered 12 July 2022 by Judge Nathaniel J. Poovey in Forsyth County Superior Court. Heard in the Court of Appeals 23 August 2023.

*Attorney General Joshua H. Stein, by Assistant Attorney General Dorian Woolaston, for the State.*

*Phoebe W. Dee for defendant-appellant.*

ZACHARY, Judge.

Defendant Judy Webster appeals from the judgment entered upon a jury's verdict finding her guilty of assault with a deadly weapon inflicting serious injury, in violation of N.C. Gen. Stat. § 14-32(b) (2021). After careful review, we conclude that Defendant received a fair trial, free from error.

## I.    Introduction

In the instant appeal, what began as a neighborly disagreement over macaroni and cheese quickly escalated into violence reminiscent of "th[e] movie Carrie" after

one resident pulled a concealed knife from her walker and just started "swinging [and] cutting."

Beginning at approximately 7:30 p.m. on 20 June 2021, the residents of Crystal Towers apartments in Winston-Salem threw a cookout to celebrate Father's Day. As set forth herein, there is substantial disagreement about the underlying details that ultimately led to violence; however, it is undisputed that the evening in question included three distinct hostile interactions between Defendant and the victim, Ms. Charon Smith ("Ms. Smith"), which began with Ms. Smith's refusal to serve some macaroni and cheese to Defendant.

## II.    Background

On 25 October 2021, a Forsyth County grand jury returned an indictment charging Defendant with assault with a deadly weapon inflicting serious injury, pursuant to N.C. Gen. Stat. § 14-32(b). This matter came on for a jury trial on 11 July 2022 in Forsyth County Superior Court, the Honorable Nathaniel J. Poovey presiding. The evidence at trial tended to show the following:

The initial dispute occurred while Ms. Smith was serving macaroni and cheese to cookout attendees under the Crystal Towers gazebo. Defendant and another resident approached and requested some macaroni and cheese, but Defendant became "upset" when Ms. Smith explained that there was "not enough" left. According to Ms. Smith, she intended to ensure that both women "would have at least got a taste" of macaroni and cheese, despite the low rations. But upon Defendant's

outburst, Ms. Smith folded up the pan of macaroni and cheese and threw it in the trash, further enraging Defendant. Defendant "started cussing" and name-calling and "talking about [Ms. Smith's] mama," among other insults.

Defendant, however, recalls this initial confrontation much differently. At trial, Defendant testified that on the evening in question, she was enjoying the Father's Day cookout with a few friends from Crystal Towers and celebrating a friend's birthday. Defendant and her friend decided to get some food; but when Defendant asked Ms. Smith for some of the macaroni and cheese that she was serving, Ms. Smith "just flipped out on [her]." Defendant contends that Ms. Smith responded, "This is my f*****' macaroni. I made this. I ain't got to give you s***." Defendant claims that although she was confused and slightly bothered by Ms. Smith's reaction, she initially walked away and returned to her friends.

The second interaction occurred a few minutes after the women's initial argument, in the apartment's lobby, near the elevator. Ms. Smith testified that she was headed upstairs to change clothes and begin cleaning up after the cookout when she again crossed paths with Defendant, who was also waiting for the elevator. Ms. Smith testified that, upon seeing Ms. Smith, Defendant resumed her expletive-filled tirade and accused Ms. Smith of following her. Defendant then "pushed and shoved [Ms. Smith] off the elevator . . . but [Defendant] knocked over a drink or something, and [Defendant] slipped and fell." At that point, Ms. Smith alleges, "a young man" entered the lobby carrying "a cane [or] a walking stick"; Defendant promptly

"snatched" the man's stick and "c[a]me at [Ms. Smith] again, swinging the stick." But Defendant did not "land any blows" during that incident, and Ms. Smith was able to back away toward the door, unscathed. Regarding the experience, however, Ms. Smith testified at trial that she "was standing there still, like, What in the world is wrong with you?"

As with the women's first altercation, at trial, Defendant presented a very different account of the elevator incident. According to Defendant, after entering the elevator, she turned around and "saw [Ms. Smith] coming[,]" so she attempted to exit. Although Defendant said, "Excuse me[,]" Ms. Smith would not allow Defendant to leave, but instead "kept pushing"; eventually, the women were "pulling and tugging with [Defendant's] walker." Then Ms. Smith "pulled [Defendant's] walker away from [her]," and Defendant "hit the ground[.]" Finding herself unable to get back up off the ground, Defendant "grabbed [a nearby man's] stick and . . . started swinging it."

The final altercation ensued outside of the apartment building. Approximately 10 to 15 minutes after the elevator incident, Ms. Smith was outside socializing with other residents when suddenly, Defendant "was coming at [her] swinging a blade." Initially, Ms. Smith, who was unarmed, did not realize that Defendant possessed a weapon, but she "went to swing back to start defending [her]self[.]" Ms. Smith quickly realized, however, that "every time [Defendant] swung, [Defendant] was cutting [her]." Upon that realization, Ms. Smith testified, she "hollered" and tried to extricate herself from the fight. Ms. Smith tried removing her shirt to escape Defendant's grip,

to no avail. Ms. Smith testified that by that point, her hands had "stopped swinging[,]" a reaction she believed was likely due to "shock or something." Meanwhile, Defendant "just kept on swinging [and] cutting, kept on swinging [and] cutting."

But again, Defendant testified to a much different version of events. According to Defendant, after the elevator incident, she went upstairs to change her wet clothes. After returning outside, Defendant was telling a friend about how Ms. Smith "just beat [her] up on the elevator" when she suddenly experienced a sensation in her head that "felt like a man hit [her]." Defendant testified that "[t]hat's when [Ms. Smith] came up and busted [Defendant] in [her] head." In response, Defendant opened her walker and retrieved a "little pocket knife[.]" Defendant testified that she "was scared because the only place [Ms. Smith] kept hitting [her] was in [the] head"—a particular danger for Defendant, who has seizures. According to Defendant, at the time, she was unable to see straight, and she believed that she "was going to die"; therefore, "every time [Ms. Smith] hit [her], [Defendant] cut [Ms. Smith]."

Kathy Holland, another Crystal Towers resident, was present at the cookout and witnessed the final altercation between Ms. Smith and Defendant. Ms. Holland testified that just before the fight, she overheard Ms. Smith ask Defendant, "You really want to fight over this?", to which Defendant replied, "Yes." The next thing Ms. Holland witnessed was blood "spraying everywhere[.]"

Officer J.H. Prisk of the Winston-Salem Police Department testified that upon reviewing the security footage of the altercation, he observed Ms. Smith "back-pedaling in an attempt to create distance, but also striking out of self-defense."

Ms. Smith was transported to the hospital and treated for multiple injuries to her face, scalp, chest, arm, and right hand. Dr. Stacie Zelman, an emergency physician at Wake Forest Atrium Health, treated Ms. Smith and testified for the State at Defendant's trial. According to Dr. Zelman, Ms. Smith was classified as "a Level II trauma" patient—potentially a "very serious" or "critical" patient—a categorization she received, in large part, due to multiple stab wounds sustained to her face, head, and scalp. Ms. Smith also required six staples in order to stop "pretty significant bleeding" from "a deep laceration to her scalp[.]"

Although Ms. Smith would eventually undergo multiple corrective surgeries to her face and right hand, none of her injuries were life-threatening. However, Ms. Smith testified that as of trial, she still suffered lasting effects including memory loss, significant scarring, and nerve damage, among other complications.

In addition to her own trial testimony, Defendant also presented two witnesses who testified that Ms. Smith had a reputation as a bully and that she was the aggressor in the affray.

During the charge conference, defense counsel requested that the jury be instructed on lesser-included misdemeanor assault offenses, asserting, *inter alia*, that the knife did not constitute a deadly weapon as a matter of law. Noting that

"[t]here's plenary evidence in this case that this knife was a deadly weapon," the trial court overruled Defendant's objection and declined her request for instructions on lesser-included offenses. The court, however, delivered Defendant's requested instructions on self-defense.

On 12 July 2022, the jury returned its verdict finding Defendant guilty of the charged offense, assault with a deadly weapon inflicting serious injury. The trial court sentenced Defendant, as a Prior Record Level III offender, to 26 to 44 months in the custody of the North Carolina Division of Adult Correction. Defendant entered oral notice of appeal in open court.

### III.    Analysis

On appeal, Defendant advances two related challenges to the jury instructions arising from the trial court's determination, over Defendant's objection, that the knife constituted a deadly weapon per se. Specifically, Defendant contends that because the knife was never located and there was little trial testimony regarding its nature and appearance, the issue of whether the knife constituted a "deadly weapon" in this case should have been a question of fact decided by the jury, not an issue of law preliminarily determined by the trial court. Therefore, Defendant argues, the trial court committed reversible error (1) by instructing the jury that the knife was a deadly weapon per se, and (2) by declining to instruct the jury on the lesser-included offense of misdemeanor assault inflicting serious injury. We disagree.

### A.    Standard of Review

"Where the defendant preserves h[er] challenge to jury instructions by objecting at trial, we review the trial court's decisions regarding jury instructions de novo." *State v. Hope,* 223 N.C. App. 468, 471, 737 S.E.2d 108, 111 (2012) (cleaned up), *disc. review denied,* 366 N.C. 438, 736 S.E.2d 493 (2013). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams,* 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (cleaned up).

The trial court's jury charge must include instructions on a lesser-included offense where the evidence at trial "would permit a jury rationally to find [the] defendant guilty of the lesser offense and acquit h[er] of the greater." *State v. Millsaps,* 356 N.C. 556, 562, 572 S.E.2d 767, 772 (2002) (cleaned up). However, no instruction on a lesser-included offense is required "when the State's evidence is positive as to each and every element of the crime charged and there is no conflicting evidence relating to any element of the charged crime." *Id.* (cleaned up).

**B.     The trial court properly determined that the knife was likely to cause death or great bodily harm under the circumstances of this case—a question of law—and instructed the jury accordingly.**

The offense of assault with a deadly weapon inflicting serious injury comprises the following essential elements: "(1) an assault (2) with a deadly weapon (3) inflicting serious injury (4) not resulting in death." *State v. Aytche,* 98 N.C. App. 358, 366, 391 S.E.2d 43, 47 (1990); *see also* N.C. Gen. Stat. § 14-32(b).

On appeal, Defendant only disputes the second element of the offense—specifically, whether the knife constituted a deadly weapon as a matter of law.[1] The outcome of the instant appeal turns upon whether the trial court properly instructed the jury that the knife that Defendant used to assault Ms. Smith constituted a deadly weapon per se under the circumstances of its use in this case.

As our caselaw makes abundantly clear, whether a particular instrument or article constitutes a "deadly weapon" for the purposes of our assault statutes generally depends upon its likelihood, under the circumstances and evidence presented, to cause death or great bodily harm. *See, e.g.*, *State v. Palmer*, 293 N.C. 633, 642, 239 S.E.2d 406, 412 (1977); *State v. McCoy*, 174 N.C. App. 105, 112, 620 S.E.2d 863, 869 (2005) ("A deadly weapon is not one that *must* kill, but rather one that is likely to cause death or great bodily harm." (emphasis added)), *disc. review denied*, ___ N.C. ___, 628 S.E.2d 8 (2006).

The rationale for requiring such case-by-case determinations is manifest: while certain items are inherently lethal, others become so solely based upon the circumstances of their use (or misuse). Indeed, it is well established in North Carolina that the "deadly character" of a particular "weapon depends sometimes more upon the manner of its use, and the condition of the person assaulted, than upon the

---

[1] Defendant concedes that there was sufficient evidence from which the jury could have found that the knife constituted a deadly weapon. Consequently, the success of Defendant's appeal turns on whether we are persuaded that this issue should have been submitted to the jury as a question of fact, rather than decided by the trial court as a matter of law.

intrinsic character of the weapon itself." *Palmer*, 293 N.C. at 642–43, 239 S.E.2d at 412–13 (citation omitted). Thus, "[w]here the alleged deadly weapon and the manner of its use are of such character as to admit of but one conclusion, the question as to whether . . . it is deadly within the foregoing definition is one of law, and the [trial c]ourt must take the responsibility of so declaring." *Id.* at 643, 239 S.E.2d at 413 (citation omitted). But in cases where the alleged deadly weapon "may or may not be likely to produce fatal results, according to the manner of its use, or the part of the body at which the blow is aimed, its alleged deadly character is one of fact to be determined by the jury." *Id.* (citation omitted).

Reviewing the issue through this lens, our appellate courts have upheld trial courts' determinations in numerous cases finding myriad implements—including a wide variety of knives—to be deadly weapons per se under the circumstances presented. *E.g.*, *State v. Hefner*, 199 N.C. 778, 779, 155 S.E. 879, 881 (1930) ("blackjack"); *State v. Smith*, 187 N.C. 469, 470, 121 S.E 737, 737 (1924) (baseball bat); *State v. Walker*, 204 N.C. App. 431, 443–46, 694 S.E.2d 484, 493–94 (2010) (approximately three-inch knife); *State v. Wiggins*, 78 N.C. App. 405, 407, 337 S.E.2d 198, 199 (1985) (box cutter); *State v. Roper*, 39 N.C. App. 256, 257, 249 S.E.2d 870, 871 (1978) ("keen bladed pocketknife").

In a similar vein, our appellate courts have also consistently held that where the evidence *properly supported* a determination by the trial court that the weapon was deadly per se—but the court nevertheless submitted the question to the jury,

which found as a matter of fact that the weapon was deadly—there could be no error in the trial court's failure to instruct on lesser-included offenses that lack proof of a deadly weapon as an essential element. *E.g.*, *State v. McKinnon*, 54 N.C. App. 475, 478, 283 S.E.2d 555, 557 (1981) ("We conclude the trial court *should have* held that the pocketknife as used by [the] defendant was a deadly weapon as a matter of law. There was, therefore, no error in the court's failure to submit the lesser offense of misdemeanor assault." (emphasis added)).

In the instant case, the alleged weapon—a small folding knife, which Defendant describes as "a little pocket knife"—was not introduced into evidence at trial. Moreover, as Defendant thoroughly argues in her appellate brief, little direct testimony was offered at trial regarding the knife's character and appearance.[2] Defendant contends that it was, therefore, improper for the trial court to instruct the jury that the knife was a deadly weapon per se; instead, Defendant contends, whether the knife was a "deadly weapon" under the circumstances was properly an issue of fact for the jury's decision. And by erroneously removing this issue from the province of the jury, Defendant argues, the trial court necessarily further erred by denying her request for jury instructions on lesser-included offenses, including assault inflicting serious injury.

---

[2] We note that this is likely due, in part, to the fact that the knife was already missing when Defendant was interviewed by law enforcement officers who responded to Crystal Towers on the night in question.

We disagree. Defendant's arguments belie a fundamental misunderstanding of both the State's evidentiary burden regarding this element and the trial court's ultimate responsibility in charging the jury.

First, although the State bears the burden of proving, *inter alia*, the *use* of a deadly weapon, the State is not required to *produce* the alleged weapon to obtain a conviction for an assault involving a deadly weapon. *See, e.g.*, N.C. Gen. Stat. § 14-32(b); *Walker*, 204 N.C. App. at 445, 694 S.E.2d at 494 ("[W]e know of no rule of law that requires the production of the alleged deadly weapon on the trial of a criminal prosecution for an assault with a deadly weapon; indeed this Court recognizes that the weapon may not be produced." (cleaned up)).

Furthermore, we disagree with Defendant's characterization of the strength and scope of the evidence presented as regards the knife itself. In addition to Defendant's trial testimony, the jury also viewed State's Exhibit 4, body-cam video footage of Defendant's interview with law enforcement officers at Crystal Towers recorded mere hours after the altercation. In the video, Defendant described the missing weapon as a "small knife," "like a pocketknife," with a "foldout" blade, which she typically stored in her walker. When asked to estimate the size of the knife, Defendant demonstrated by holding her index fingers a few inches apart, in accord with her description of a small, foldout blade.

Nor do we agree with Defendant that the trial court "misapplied" well-established law by "using the injuries sustained by Ms. Smith as [the court's] basis

for determining the weapon's dangerousness" because "there was no serious bodily injury alleged or proven . . . and because the trial [court] seems to have considered facts not in evidence when he made his determination." To the contrary, "well-established principles of North Carolina law allow the extent to which a particular instrument is a deadly weapon to be inferred based on the effects resulting from the use made of that instrument." *Walker*, 204 N.C. App. at 446, 694 S.E.2d at 494.

Here, we hold, consistent with the trial court's conclusion, that the knife was a deadly weapon per se based upon the circumstances of its use. The evidence in this case amply supports the conclusion that Ms. Smith suffered great bodily harm as a result of Defendant's assault upon her with the knife, even absent production of that knife at trial. Ms. Smith sustained multiple injuries to her face, head, chest, arm, and hand, including several that continued to cause her lingering issues as of the trial in this matter. Ms. Smith testified that she suffers ongoing damage to the tendons, nerves, and ligaments in her right hand, and that her "memory comes in and out sometimes because [she] was cut . . . in [her] temple[.]" Ms. Smith required surgeries to her face and right hand—her dominant hand—due to injuries sustained in the assault; however, as of trial, she continued to experience pain and ongoing nerve damage in her hand and had not yet regained its full use.

Moreover, Dr. Zelman testified that Ms. Smith was admitted to the hospital as "a Level II trauma" patient, which "could potentially be a very serious patient or critical patient[,]" due to "a deep laceration to her scalp and multiple other lacerations

to her face and her hands." Ms. Smith ultimately required six staples to curtail the "pretty significant bleeding" caused by this wound. And Ms. Holland, another Crystal Towers resident who witnessed the assault, testified similarly regarding the amount of blood at the scene; she recalled seeing Ms. Smith "just standing there . . . blood just coming out," like something out of the horror movie, "Carrie."

Notwithstanding Defendant's arguments to the contrary, the circumstances and manner of Defendant's use of the knife in this case "are of such character as to admit of but one conclusion": the knife was a deadly weapon as a matter of law. *Palmer*, 293 N.C. at 643, 239 S.E.2d at 413 (citation omitted). We simply cannot agree with Defendant that the injuries described above—most notably, deep knife wounds to the scalp and temple, and blood loss so extensive as to invoke memories of a notoriously gory horror movie—"merely raise[ ] a factual issue about [the knife's] potential for producing death." *Walker*, 204 N.C. App. at 444, 694 S.E.2d at 493 (citation omitted).

Having concluded that the trial court properly instructed the jury that the knife constituted a deadly weapon per se under the circumstances of this case, we necessarily also hold that the trial court appropriately declined Defendant's request for jury instructions on lesser-included offenses.

As explained above, the trial court did not err by determining, as a matter of law, that the knife constituted a deadly weapon—an instrument that was "likely to produce death or great bodily harm, under the circumstances of its use[,]" *Palmer*,

293 N.C. at 642, 239 S.E.2d at 412 (citation omitted)—nor by instructing the jury accordingly. The State's evidence was "positive as to each and every element of the crime charged and there [wa]s no conflicting evidence relating to any element of the charged crime." *Millsaps*, 356 N.C. at 562, 572 S.E.2d at 772 (cleaned up). Accordingly, the trial court was not required to instruct the jury on assault inflicting serious injury or any other lesser-included offenses.

## IV.    Conclusion

Upon the evidence presented, the trial court did not err by instructing the jury that the knife was a deadly weapon as a matter of law, nor by denying Defendant's request for instructions on any lesser-included offenses omitting that element.

We thus conclude that Defendant received a fair trial, free from error.

NO ERROR.

Judges DILLON and WOOD concur.