An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-719

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

STATE OF NORTH CAROLINA

v.

KIDADA SHIDEEAH LOTT and JOSE
ROBERTO VALENTINE

Wake County
Nos. 11 CRS 218625—28, 218636—
39, 218666, 218672

Appeal by defendants from judgments entered 21 September 2012 by Judge Paul C. Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 8 January 2014.

*Attorney General Roy Cooper, by Special Deputy Attorney General M. A. Kelly Chambers, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Kathleen M. Joyce, for defendant-appellant Jose Roberto Valentine.*

*Kimberly P. Hoppin for defendant-appellant Kidada Shideeah Lott.*

BRYANT, Judge.

Where there was sufficient evidence presented at trial to support a jury instruction on the theory of aiding and abetting, the trial court did not err in its instruction. Where defendant Valentine's trial counsel conceded to the jury, with Valentine's

consent, that Valentine was guilty of misdemeanor breaking and entering, the concession was not *Harbison* error. Where the trial court instructed the jury that a gunshot wound from a bullet passing through the victim's buttock and out the front of his thigh was a serious injury, we find no error.

The evidence presented tended to show that on the evening of 9 August 2011, Robert Wright, Camille Perry, Britney Montgomery, Belinda Montgomery, and Crystal Daniel were in a house located at 11 Maywood Avenue in Raleigh. In addition to the above-named adults, there were seven children present, all under the age of nine years. Over the course of the evening, Crystal and Britney went to bed, as did all seven children. Belinda, Camille, and Robert stayed up playing cards. Two times that night, Robert stepped outside to smoke. The first time at 2:00 a.m., he noticed that an SUV drove by twice. The second time at 3:00 a.m., Robert observed the same vehicle drive down Maywood Avenue, then park diagonally across from the house. He noted the vehicle lights were turned off but the engine was still running. No one exited the vehicle at that time. Fifteen to twenty minutes later, the vehicle was still sitting there. Between 3:30 and 4:00 a.m., Robert called for a ride to take him home. When Robert saw his ride drive by, he flicked the lights

to identify the house. As he stepped out of a side door, he was shot. Robert then ran to the car waiting to give him a ride home and told the driver to take him to the hospital. In route to the hospital, Robert reported the shooting to the Raleigh Police Department, which dispatched law enforcement officers to meet him at WakeMed Hospital. Robert described the SUV he observed sitting across from 11 Maywood Avenue as a grey Dodge Durango.

Crystal testified that she was in her bed when Belinda and Camille ran into her room screaming. She heard a man's voice tell Britney to get out and go into the room with Crystal, Britney, and Camille. When Britney walked into Crystal's bedroom, Crystal recognized the man with Britney and noted that he held a handgun. Crystal later identified the man as defendant Jose Roberto Valentine. Valentine asked for each woman's name and then grabbed Crystal, saying "Yeah, you the one I want." A gunshot was fired in the hallway and Valentine pulled Crystal out of her bedroom, where she observed two more men. "One of them was just big and tall, the one that was standing at the door. The other guy, he was just a regular size person [less than six feet tall]." All of the intruders wore dark clothes and other than Valentine, wore masks covering their

faces. Valentine threatened Crystal and warned her not to call the police. Then he and the two other men left the house taking a Playstation III video game system.

Officer Michael Keon, a patrolman with the Raleigh Police Department, was patrolling the southeast district of Raleigh on the evening of 9 August 2011. After hearing reports of a shooting at 11 Maywood Avenue, he proceeded in the direction of that residence. The dispatcher provided the description of a suspect vehicle, a grey SUV – Dodge Durango. Within two minutes, Officer Keon observed what he described as a silver Dodge Durango at the intersection of Raleigh Boulevard and Martin Luther King Blvd. The Durango was the only other car on the road. Officer Keon followed the SUV until additional law enforcement officers could provide assistance, then conducted a stop. The driver was a female later identified as defendant Kidada Shideeah Lott. There were three male passengers in the SUV, including defendant Valentine. One passenger fled the scene upon the vehicle stop but was apprehended shortly thereafter. Inside the vehicle, law enforcement officers found a ski mask, latex gloves, and two firearms.

Defendant Kidada Shideeah Lott was indicted on charges of robbery with a dangerous weapon, first-degree burglary, assault

with a deadly weapon with intent to kill inflicting serious injury, and discharging a weapon into an occupied dwelling. Defendant Jose Roberto Valentine was indicted on charges of discharging a weapon into an occupied dwelling, first-degree burglary, robbery with a dangerous weapon, assault with a deadly weapon with intent to kill inflicting serious injury, two counts of assault with a deadly weapon, two counts of possession of a firearm by a convicted felon, and possession of a stolen firearm. The State thereafter dismissed both counts of assault with a deadly weapon against Valentine but subsequently issued a superseding indictment against Valentine for possession of a firearm by a convicted felon.

The cases against Lott and Valentine were joined for trial.[1] Trial commenced in Wake County Superior Court during the 11 September 2012 session with the Honorable Paul C. Ridgeway, Judge presiding.

At the close of the State's evidence, the trial court allowed Valentine's motion to dismiss the charge of possession of a stolen firearm. During closing arguments, Valentine's

---

[1] Initially, co-defendants Jimmie Cornelius and Hakim Lamar Jacobs were joined for trial with Lott and Valentine. However, while the record is not clear as to the disposition of the cases involving Cornelius and Jacobs, only the joined cases involving Lott and Valentine were tried before a jury.

attorney conceded to the jury that Valentine was guilty of possession of a firearm by a felon, was present during the home invasion, and was guilty of misdemeanor breaking and entering.

The jury returned the following verdicts. Lott was found guilty of robbery with a dangerous weapon, first-degree burglary, and assault with a deadly weapon inflicting serious injury; Valentine was found guilty of first-degree burglary, robbery with a dangerous weapon, assault with a deadly weapon inflicting serious injury, and possession of a firearm by a convicted felon. Both Lott and Valentine were found not guilty of discharging a weapon into occupied property.

In accordance with the jury verdict against Lott, the trial court entered a consolidated judgment on the charges of robbery with a dangerous weapon and first-degree burglary, imposing a sentence of 73 to 100 months, and as to the charge of assault with a deadly weapon inflicting serious injury, a consecutive term of 29 to 44 months. In accordance with the jury verdict against Valentine, the trial court sentenced him to a term of 78 to 103 months on the charge of first-degree burglary, 30 to 45 months on the charge of robbery with a dangerous weapon, and 30 to 45 months on the consolidated charges of assault with a

deadly weapon inflicting serious injury and possession of a firearm by a felon, all to be served consecutively.

Lott and Valentine appeal.

_____

*Lott's appeal*

Lott argues that the trial court erred by instructing the jury on the theory of aiding and abetting, contending there was insufficient evidence to support such an instruction. Specifically, Lott contends the State's evidence was sufficient to show only her presence in the SUV sometime after three perpetrators invaded a home but was insufficient to establish that she intended to aid in the commission of any crime. We disagree.

The trial court instructed the jury on all of the substantive offenses including robbery with a dangerous weapon, first-degree burglary, and assault with a deadly weapon inflicting serious injury. The jury was also instructed that "[a] person who aids and abets another to commit a crime is guilty of that crime" and further instructed on the requirements for finding guilt beyond a reasonable doubt based on a theory of aiding and abetting.

We note that during the charge conference, Lott accepted the trial court's proposal to instruct the jury on the theory of aiding and abetting with regard to the charges against Lott:

> [The Court]: The State has indicated that it is asking to not include instructions on acting in concert with respect to Defendant Lott and only give the instructions on aiding and abetting. I do agree that it certainly is less confusing to have only that instruction.
> Do either of you wish to be heard on that?

> [Defense counsel for Lott]: No, Your Honor. I'll accept that.

The trial court thereafter gave the above mentioned instructions on the substantive offenses as well as instructions on aiding and abetting. Following the trial court's instructions to the jury, Lott raised no objection to the instructions as given.

In a criminal case, an issue not preserved by objection noted at trial may be made the basis of an issue presented on appeal when the judicial action in question is specifically and distinctly contended to amount to plain error. N.C. R. App. P. 10(a)(4) (2014). "[P]lain error analysis is limited to reviewing jury instructions and evidentiary matters." *State v. Ross*, 207 N.C. App. 379, 386–87, 700 S.E.2d 412, 418 (2010) (quoting *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39–40 (2002)) (quotations omitted); *see also State v. Jaynes*, 342 N.C.

249, 276, 464 S.E.2d 448, 465 (1995) (reviewing the trial court's jury instruction for plain error).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and quotations omitted).

Our Supreme Court has previously approved a jury charge setting forth the three criteria for finding a defendant guilty of a crime on the theory of aiding and abetting: "(1) that the crime was committed by another; (2) that the defendant knowingly advised, instigated, encouraged, procured, or aided the other person; and (3) that the defendant's actions or statements caused or contributed to the commission of the crime by the other person." *State v. Francis*, 341 N.C. 156, 161, 459 S.E.2d 269, 272 (1995) (citation omitted); *see also State v. Lyles*, 19 N.C. App. 632, 636, 199 S.E.2d 699, 702 (1973) ("The driver of a getaway car is present at the scene of the crime, and he is a

principal rather than an accessory before the fact. Therefore, there is no error in . . . the court's instructing the jury on aiding and abetting.").

The State's evidence was sufficient to support the trial court's instruction on aiding and abetting. On the evening in question, Robert Wright observed a grey Dodge Durango drive by 11 Maywood Avenue at least two times between 2:00 and 3:30 a.m. Then, between 3:30 and 4:00 a.m., Wright observed this vehicle park across the street, and turn its lights off, while the engine kept running. As Wright stepped outside of his friends' home to wait for his ride, he was shot by someone in the SUV. Thereafter, three men wearing dark clothes, two of whom wore masks, entered 11 Maywood Avenue with at least two firearms. One of the firearms discharged while defendant Valentine was holding another firearm in a bedroom containing the three women. The men fled after taking a video game system and warning the occupants not to call the police.

Officer Keon was patrolling Raleigh's southeast district when he learned of the reported shooting at 11 Maywood Avenue and received the description of a suspect vehicle, a grey SUV Dodge Durango. Officer Keon began to head toward 11 Maywood Avenue when he encountered what he described as a silver Dodge

Durango. Approximately two minutes elapsed between the time Officer Keon received the report of a shooting at 11 Maywood Avenue along with a description of the suspect vehicle and when he spotted the vehicle. He saw no other vehicles on the road in the interim. Officer Keon stopped the SUV. Lott was the driver. In response to Officer Keon's question as to how many people were in the vehicle, "she told me just her two brothers[,]" when in fact there were three passengers in the vehicle. "And then I also asked her if there were any weapons in the vehicle, and she said no." Suddenly, the front seat passenger opened the door and ran. Lott started the vehicle as if to drive away; however, on Officer Keon's command, Lott immediately turned the vehicle off and threw the keys outside. In the SUV, police officers found a black ski mask, latex gloves, and two firearms.

Considering the temporal proximity between the shooting at 11 Maywood Avenue and Officer Keon's observation of the suspect vehicle in the vicinity of the shooting, along with the fact that no other vehicles were on the road in those early morning hours, coupled with the fact that four individuals were in the car – three of whom were men – and three men were reported to be involved in the home invasion, and that Lott participated as the

driver of what appeared to be the getaway car and gave misleading responses to inquiries as to the number of people in the SUV and the presence of weapons, this evidence was more than sufficient to support the trial court's instruction on the theory of aiding and abetting. *See id.* Accordingly, we overrule Lott's argument.

## *Valentine's appeal*

Valentine first argues that he received ineffective assistance of counsel. Specifically, Valentine contends he is entitled to a new trial because defense counsel committed a *Harbison* error during closing arguments by admitting Valentine was guilty of misdemeanor breaking and entering. We disagree.

Appellate assessments of ineffective assistance of counsel claims involve mixed questions of law and fact. *Strickland v. Washington*, 466 U.S. 668, 698, 80 L. Ed. 2d 674, 700 (1984). We review the questions of law de novo. *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Id.* at 632–33, 669 S.E.2d at 294. We review questions of fact to determine if the finding is supported by competent evidence. *Pineda-Lopez v. N.C. Growers Ass'n*, 151 N.C. App. 587, 589, 566 S.E.2d 162, 164

(2002).

Pursuant to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. Pursuant to our North Carolina Constitution, "[i]n all criminal prosecutions, every person charged with crime has the right to . . . have counsel for defense . . . ." N.C. CONST. art. I, § 23. Our Supreme Court has "conclude[d] that ineffective assistance of counsel, *per se* in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507—08 (1985). "The practical effect is the same as if counsel had entered a plea of guilty without the client's consent. Counsel in such situations denies the client's right to have the issue of guilt or innocence decided by a jury." *Id.* at 180, 337 S.E.2d at 507 (citation omitted). This is true even when defense counsel concedes the defendant's guilt to either the charged offense or a lesser-included offense. *State v. Matthews*, 358 N.C. 102, 109, 591 S.E.2d 535, 540 (2004) (Our Supreme Court granted the defendant a new trial on the charge of first-degree murder where

defense counsel conceded the defendant's guilt to the charge of second-degree murder and the jury returned a verdict of guilty to the charge of first-degree murder. "*Harbison* requires that the decision to concede guilt to a lesser included crime 'be made exclusively by the defendant.'" (citation omitted)); *see also State v. Maready*, 205 N.C. App. 1, 695 S.E.2d 771 (2010) (reviewing whether defense counsel's argument admitting the defendant's guilt to a lesser-included offense amounted to *Harbison* error).

However, where defendant allows counsel to concede guilt to a crime, no *Harbison* violation occurs. *See State v. Johnson*, 161 N.C. App. 68, 77—78, 587 S.E.2d 445, 451 (2003) ("Although the better practice would be for defense counsel to make a record of a defendant's consent to concessions or admissions of guilt prior to making those concessions . . . we conclude that the trial court's inquiry [following defense counsel's concession of guilt] was adequate to establish that defendant had previously consented to his counsel's concession that he was present and had fired the shots that killed three people and wounded a fourth.").

Here, following the jury voir dire but prior to the presentation of evidence, Valentine's defense counsel brought to

the court's attention that *Harbison* issues would likely arise during trial. The trial court engaged in the following inquiry of Valentine:

> [Valentine's defense counsel]: Yes, sir, and I apologize not to bring this up before the jury came in. There are some *Harbison* issues in this case. **I anticipate admitting to the jury and arguing to the jury that they should be free to find certain elements, and included among those basically I think I'm going to admit that he was in that house, that identity is not an issue in this particular case.** While I'm not prepared at this point to say that they've met any of the charges that are actually against him, **potentially lesser included charges would include misdemeanor breaking and entering**, second degree trespassing, communicating threats, among other things that are not necessarily lesser includeds, but **that I'm going to be admitting to the jury that they would probably be able to find beyond a reasonable doubt and I would ask the Court to inquire from my client whether -- whether the Court's comfortable with him and whether I have his consent to do that.**
>
> THE COURT: Mr. Valentine, if you could stand for me for a moment I need to discuss this matter with you.
>
> . . .
>
> Your attorney has indicated to me that as a matter of strategy he is going to be admitting to this jury that perhaps certain elements of the offenses have been met and that they can assume those to be true. Do you understand that?
>
> DEFENDANT VALENTINE: Yes, I do.

THE COURT: And as I understand it, in particular, he is intending to inform the jury that you were present at the house located at [11 Maywood Avenue] on the night in question.

DEFENDANT VALENTINE: Yes.

. . .

THE COURT: And he is also going to acknowledge that your identity as a person who was at the scene of these alleged crimes is also not an issue. Do you understand that?

DEFENDANT VALENTINE: Yes.

. . .

THE COURT: And that by your attorney's acknowledging or informing the jury that these issues are not in dispute, he's in effect removing the state's obligation to prove these matters beyond a reasonable doubt. Do you understand that?

DEFENDANT VALENTINE: Yes, I do.

. . .

THE COURT: Now, have you had an opportunity to fully discuss the strategic choice that your attorney is making with him?

DEFENDANT VALENTINE: Yes.

THE COURT: And do you consent to the strategic choice that your attorney is making?

DEFENDANT VALENTINE: Yes, I do.

(Emphasis added).

Before the jury during closing argument, Valentine's defense counsel made the following concession:

> The good news for your conscience is you're going to get to find him guilty of some stuff. . . .
>
> **If you are not convinced, fully convinced and entirely satisfied, that the intention when they broke into that house was to shoot her or was to steal from them, then you get to find him guilty of misdemeanor breaking and entering.** If you are intellectually honest with yourself, with each other, if you do your job the way you promised that you would, [that is the charge] you find him guilty of.

(Emphasis added).

In accordance with Valentine's acknowledgment, as presented to the trial court prior to the presentation of evidence, defense counsel admitted Valentine's guilt after the close of the evidence to misdemeanor breaking and entering, a lesser-included offense of first-degree burglary, the offense for which defendant was indicted. *See State v. Patton*, 80 N.C. App. 302, 305, 341 S.E.2d 744, 746 (1986) (misdemeanor breaking and entering is a lesser-included offense of first-degree burglary). Therefore, where the trial court made a *Harbison* inquiry of Valentine and Valentine indicated his understanding of and consent to the defense strategy of admitting to misdemeanor

breaking and entering, this does not constitute error. This was not *Harbison* error and is not ineffective assistance of counsel *per se*. For the foregoing reasons, we overrule Valentine's argument. *See Johnson*, 161 N.C. App. at 77—78, 587 S.E.2d at 451.

*Serious injury*

Valentine next argues that the trial court erred by instructing the jury over Valentine's objection that Robert Wrights' injury, a single gunshot wound to the buttocks and upper thigh, was a serious injury. We disagree.

We review challenges to jury instructions de novo. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009) (citations omitted).

> [Our Supreme Court] has not defined "serious injury" for purposes of assault prosecutions, other than stating that the injury must be serious but it must fall short of causing death and that further definition seems neither wise nor desirable. Whether "serious injury" has been inflicted must be decided on the facts of each case.

*State v. Ramseur*, 338 N.C. 502, 507, 450 S.E.2d 467, 471 (1994) (citations and quotations omitted).

Valentine was indicted on assault with a deadly weapon with intent to kill inflicting serious injury in violation of General Statutes, section 14-32(a). "The essential elements of assault

with a deadly weapon with intent to kill inflicting serious injury are: (1) an assault, (2) with a deadly weapon, (3) with intent to kill, (4) inflicting serious injury, (5) not resulting in death." *State v. McLean*, 211 N.C. App. 321, 324, 712 S.E.2d 271, 275 (2011) (citation and quotations omitted).

After the close of the evidence, the trial court instructed the jury as follows:

> The defendant Jose Roberto Valentine has been charged with assault with a deadly weapon with intent to kill inflicting serious injury. For you to find the defendant guilty of this offense, the State must prove four things beyond a reasonable doubt.
>
> First, that the defendant assaulted the victim, Robert Lamont Wright, by intentionally shooting him.
>
> Second, that the defendant used a deadly weapon. A handgun is a deadly weapon.
>
> Third, the State must prove that the defendant had the specific intent to kill the victim.
> . . .
>
> And, fourth, that the defendant inflicted serious injury. *A gunshot wound to the buttock and upper thigh is a serious injury.*
>
> . . .
>
> If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant, acting either by himself or acting together with other

persons, intentionally shot the victim, Robert Lamont Wright, with a handgun and that the defendant or a person with whom the defendant was in concert with intended to kill the victim and did seriously injure him, it would be your duty to return a verdict of guilty. If you do not so find or have a reasonable doubt as to one or more of these things, you will not return a verdict of guilty of assault with a deadly weapon with intent to kill inflicting serious injury but would consider whether the defendant is guilty of assault with a deadly weapon inflicting serious injury.

(Emphasis added).

The serious injury element of N.C. Gen. Stat. § 14-32 [("Felonious assault with deadly weapon with intent to kill or inflicting serious injury; punishments")] means a physical or bodily injury. . . . Among the factors that have been deemed relevant in determining whether serious injury has been inflicted are: (1) pain and suffering; (2) loss of blood; (3) hospitalization; and (4) time lost from work. . . . The cases that have addressed the issue of the sufficiency of evidence of serious injury appear to stand for the proposition that as long as the State presents evidence that the victim sustained a physical injury as a result of an assault by the defendant, it is for the jury to determine the question of whether the injury was serious.

*State v. Walker*, 204 N.C. App. 431, 446—47, 694 S.E.2d 484, 494—95 (2010) (citations and quotations omitted). In *State v. Hedgepeth*, 330 N.C. 38, 409 S.E.2d 309 (1991), our Supreme Court

found merit in the reasoning of this Court in *State v. Pettiford*, 60 N.C. App. 92, 298 S.E.2d 389 (1982), considering whether a trial court could peremptorily instruct a jury on the serious injury element of an assault charge under N.C.G.S. § 14-32. *Hedgepeth*, 330 N.C. at 54, 409 S.E.2d at 318. Our Supreme Court held that "[i]n the absence of conflicting evidence, a trial judge may instruct the jury that injuries to a victim are serious as a matter of law if reasonable minds could not differ as to their serious nature." *Id.* at 54, 409 S.E.2d at 318—19.

Here, the evidence is undisputed that Robert suffered a gunshot wound that extended from his buttock through the front of his thigh. Robert testified that he jumped from the pain and ran to the car to carry him to the hospital. "I showed him all the blood and stuff everywhere. That's when he knew it was serious. He got on the gas a little more, you know?"

> Q. What kind of treatment did you get
> while you were at the hospital?
>
> A. Um, it was just in and out. Hit no
> bones or nothing so they just flushed
> it, packed it, a little gauze stuff,
> ran water through it.
>
> Q. Did it hurt?
>
> A. Yeah. I just left on my own.
>
> Q. Pardon me?

A.  I just left. Stayed about eight hours.

Q.  Did your injury cause you any lasting effects?

A.  Slightly in the walk . . . .

We hold that under these facts and our case law reasonable minds cannot differ as to the seriousness of Wright's injuries. *See id.* at 55, 409 S.E.2d at 319 ("We think that reasonable minds could not differ as to the seriousness of Mrs. Hedgepeth's physical injuries. A bullet ripped through her ear mere inches from her skull. She required emergency room treatment for a gunshot wound, powder burns and lacerations on her hand and head. Her testimony indicates that her physical injuries may have some permanency since she was still suffering from daily ringing in her ear at the time of trial."). *Compare with State v. Bagley*, 183 N.C. App. 514, 527, 644 S.E.2d 615, 623—24 (2007) (holding reasonable minds could differ as to whether an injury was serious where after suffering from a gunshot that passed through his leg, the victim refused help from a passerby, went home, waited thirty minutes, returned to the scene of the shooting, was interviewed by a police officer, asked a paramedic to look at his leg, was then transported to a hospital where medical staff "squirted water on it, gave him pain pills, and released him after about two hours," and the victim has no on-

going difficulties from the wound).  Accordingly, Valentine's argument is overruled.

No error.

Judges CALABRIA and GEER concur.

Report per Rule 30(e).